[No. 34929. *En Banc.* January 8, 1959.]

THE STATE OF WASHINGTON, *on the Relation of Yellow Cab Service, Inc., Plaintiff,* v. THE SUPERIOR COURT FOR KING COUNTY, *Lloyd Shorett, Judge, Respondent.*[1]

[1]Reported in 333 P. (2d) 924.

*Little, LeSourd, Palmer, Scott & Slemmons,* for relator.

*Bassett, Davies & Roberts,* for respondent.

HILL, C. J.—This is an application for a writ of mandate sought by the relator, Yellow Cab Service, Inc., a Washington corporation, to direct the superior court of King county to take jurisdiction of its action against the International Brotherhood of Teamsters (hereinafter referred to as the union) to enjoin the picketing of its premises. The union successfully attacked the superior court's jurisdiction over the relator's action on the ground that the only proper forum was the National Labor Relations Board.

Some background on the controversy between the relator and the union is necessary. Until 1955, the Yellow Cab company in Seattle was a partnership. During 1955 and 1956, a plan of liquidation was put into effect, under which all of the taxicabs were sold to some one hundred eighteen individual Washington corporations independent in ownership from the relator corporation and from the original partnership. These one hundred eighteen individual corporations, most of which purchased just one taxicab, then undertook the functions of operating their respective taxicabs. All taxicabs were purchased under conditional sales contracts from the partnership, none of which has been completely paid off as yet.

The trial court found that the relator corporation was organized for two purposes: (1) for service to the one hundred eighteen individual taxicab operators, and (2) for assurance to the partnership that the taxicabs it had sold would ultimately be paid for. The relator corporation is controlled by the original partnership.

The central dispatching facilities were transferred to the relator. The relator also furnishes for the individual taxicab operators accounting and bookkeeping services, advertising services, and services as a bargaining agent for insurance upon all of the taxicabs. From the partnership the

relator has derived certain exclusive contractual rights for Yellow Cabs to pick up arriving passengers at the Seattle railroad terminals, airports, and passenger steamship docks. The relator holds and owns the Yellow Cab color rights, and the good will attached to the name of the Yellow Cab company, and grants their use to the individual taxicab operators.

As security during the period in which the taxicabs are being paid for, the partnership retains, through its conditional sales contracts, a considerable control over the quality of the Yellow Cab service. The conditional sales agreements give the partnership the right to repossess taxicabs if their operators are guilty of breaches of good operating procedure as defined by the directors of the relator corporation, though, in practice, no such repossession has taken place. Matters of operating procedure and discipline of taxicab operators are handled through an operating committee of all of the operators, plus the representatives of the relator. Power to discipline operators is sometimes delegated by the operating committee to a "personnel manager" supplied by the relator.

In 1956, the relator and all of the operators bargained together with the union in making a contract which all parties signed. This contract terminated on June 1, 1958. The relator claims that it has accepted the union contract offered this year, and that many of the independent operators have also done so. The union, it is charged, has refused to sign the contract with the relator or any of the operators until some twenty to thirty of the operators, who have not at this time accepted the offered contract, be persuaded, or compelled, to accept it. Furthermore, the relator charges that as a result of the union's dispute with these twenty to thirty operators the union is picketing the relator's place of business in Seattle, and such picketing has caused relator's crew of dispatchers to leave their jobs and remain away until such time as all of the taxicab operators, along with relator, agree to the union's contract. The relator, therefore, claims that it has no part in whatever labor dispute now exists, and that the picketing of its premises can properly be enjoined.

The merits of this case were never determined in the superior court, due to that court's decision that it did not have jurisdiction to proceed with the case. The superior court decided that the Yellow Cab system was in interstate commerce and that the case presented a labor dispute affecting interstate commerce over which the National Labor Relations Board would have jurisdiction. Relying on *Guss v. Utah Labor Relations Board* (1957), 353 U. S. 1, 1 L. Ed. (2d) 601, 77 S. Ct. 598, the superior court held that the federal jurisdiction over this case was exclusive and pre-empted the state court's jurisdiction.

The National Labor Relations Act empowers the National Labor Relations Board "to prevent . . . any person from engaging in any unfair labor practice . . . affecting commerce." 49 Stat. 453, 29 U. S. C. A. § 160 (a). The definition of the term "affecting commerce" is given as follows, at 49 Stat. 450, 29 U. S. C. A. § 152 (7):

"The term 'affecting commerce' means in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce."

The term "commerce" used herein at all times refers to interstate commerce subject to Federal regulation. See 49 Stat. 450, 29 U. S. C. A. § 152 (6).

The first question to be answered concerning the National Labor Relations Board's jurisdiction in this case is whether Seattle's Yellow Cab system is "in [interstate] commerce." The conclusion of this court is that it is not.

The union places some reliance on a recent press release (October 2, 1958) from the National Labor Relations Board indicating that it will assume jurisdiction in cases involving taxicab companies where the annual gross volume of business is $500,000 or more. We are of the opinion that the ultimate test is not the amount of gross volume of business, but whether the local transportation service is an integral part of interstate commerce. *Guss v. Utah Labor Relations Board, supra.*

The Yellow cabs are based in the city of Seattle and operate almost entirely within King county. In order to establish that they are in interstate commerce, the union relies upon the business these taxicabs do in picking up and delivering passengers at the railroad terminals, airports, and passenger steamship docks. The total gross revenues received by all of the hundred and eighteen taxicab operating corporations from July 1, 1957, through June 30, 1958, was $1,429,914.02. Gross revenues received from picking up passengers from the Seattle airports were $141,460.80 from Seattle-Tacoma Airport and $14,601.60 from King County Airport (Boeing Field). An estimate was made at the trial that this constituted seventy per cent of the full business of these taxicabs in serving these airports, the remaining thirty per cent involving trips *to* the airports. Not all of these gross revenues came from passengers traveling interstate, however it appears that a substantial portion did.

No similar accounting was made concerning the gross revenues derived from servicing the railroad terminals or the passenger steamship docks, except for a relatively few passengers who, on prearranged tours, arrived at railroad terminals and took taxicabs directly to the Canadian Pacific docks, paying their taxicab fare by coupon. The gross revenues from the coupons received from these travelers totalled just $1,436.55 during the accounting year (approximately one tenth of one per cent of the gross revenues).

A taxicab company having relatively the same scope of business was considered by the Supreme Court of the United States in *United States v. Yellow Cab Co.* (1947), 332 U. S. 218, 91 L. Ed. 2010, 67 S. Ct. 1560. That case concerned the sufficiency of a complaint brought under the Sherman Antitrust Act, involving, among other things, monopolistic practices in the Chicago taxicab fleet. The court held that the Sherman act did not apply to the Chicago taxicab business because this manner of transportation was too predominantly a local activity to constitute an integral part of interstate commerce. The court held that,

". . . when local taxicabs merely convey interstate train passengers between their homes and the railroad sta-

tion in the normal course of their independent local service, that service is not an integral part of interstate transportation. . . ." 332 U. S. at 233.

As explanation for this holding, the court said:

"In a sense, of course, a traveler starts an interstate journey when he boards a conveyance near his home, office or hotel to travel to the railroad station, from which the journey is continued by train; and such a journey ends when he alights from a conveyance near the home, office or hotel which constitutes his ultimate destination. Indeed, the terminal points of an interstate journey may be traced even further to the moment when the traveler leaves or enters his room or office and descends or ascends the building by elevator.

"But interstate commerce is an intensely practical concept drawn from the normal and accepted course of business. *Swift & Co. v. United States*, 196 U. S. 375, 398; *North American Co. v. S. E. C.*, 327 U. S. 686, 705. And interstate journeys are to be measured by 'the commonly accepted sense of the transportation concept.' *United States v. Capital Transit Co.*, 325 U. S. 357, 363. Moreover, what may fairly be said to be the limits of an interstate shipment of goods and chattels may not necessarily be the commonly accepted limits of an individual's interstate journey. We must accordingly mark the beginning and end of a particular kind of interstate commerce by its own practical considerations.

"Here we believe that the common understanding is that a traveler intending to make an interstate rail journey begins his interstate movement when he boards the train at the station and that his journey ends when he disembarks at the station in the city of destination. What happens prior or subsequent to that rail journey, at least in the absence of some special arrangement, is not a constituent part of the interstate movement. . . ." 332 U. S. at 231 and 232.

The task of drawing the line which bounds interstate commerce is anything but simple. *United States v. Yellow Cab Co.*, *supra*, has drawn such a line, however, and we consider its holding to be an appropriate authority for the position we here take.[2]

---

[2] That *United States v. Yellow Cab Co.*, *supra*, was decided under the Sherman act does not make it less an authority in the instant case.

More recently the Ninth Circuit Court of Appeals has considered the question of whether employees who drove airport limousines back and forth between downtown Honolulu and the airport were within the provisions of the Fair Labor Standards Act. See *Mateo v. Auto Rental Co.* (1957), 240 F. (2d) 831. The precise issue in that case was whether the drivers of so-called "airporter" vehicles in Honolulu were engaged in interstate commerce, and the "ultimate test is whether the local transportation service is an 'integral step in the interstate movement'." The court held that the drivers were not engaged in "interstate commerce."

A similar holding has also been made by the National Labor Relations Board in *Checker Cab Co.* (1954), 110 N. L. R. B. 683, wherein it was stated:

". . . Taxicab companies, by their very nature, perform local operations and are essentially local entities. To assert jurisdiction over such enterprises would neither comport with the congressional intent that the Board refrain from extending its activities to matters of local significance, nor otherwise effectuate the policies of the Act."

■ We do not believe that whatever unfair labor practice may be present in this case can possibly be said to be "burdening or obstructing commerce" (see 49 Stat. 450, 29 U. S. C. A. § 152(7), quoted above). There is no testimony in the record that this picketing has impaired taxicab service to or from the railroad terminals, airports, and docks, and hence no evidence of any effect upon interstate commerce sufficient to justify the application of the National Labor Relation Act. *United States v. Yellow Cab Co., supra.* No such circumstance is present in this case.

---

In that case, as in this one, the issue was whether there was any appreciable aspect of interstate commerce involved in the city's taxicab business. The court said, page 225, "But the amount of interstate trade thus affected by the conspiracy is immaterial in determining whether a violation of the Sherman Act has been charged in the complaint. Section 1 of the Act outlaws unreasonable restraints on interstate commerce, regardless of the amount of the commerce affected. *United States v. Socony-Vacuum Oil Co.*, 310 U. S. 150, note 59, p. 225; *Apex Hosiery Co. v. Leader*, 310 U. S. 469, 485. . . ." Hence it is enough if some appreciable part of interstate commerce is the subject of a monopoly, a restraint or a conspiracy.

It would be easier to assert as interstate commerce the carriage of those above-mentioned passengers on prearranged tours who take Yellow Cabs directly from the railroad terminals to the Canadian Pacific docks. A comparison of gross revenues derived from this source, however, against the total gross revenues received from all Yellow Cab operations, shows that this station-to-docks business comprises one tenth of one per cent of the total Yellow Cab operations.

██ The issue presented here concerning the scope of interstate commerce requires a determination guided by practical considerations, not technical conceptions. *Mateo v. Auto Rental Co., supra.* If it be conceded that one tenth of one per cent of its total operations is in interstate commerce, we do not believe that Seattle's Yellow Cab system constitutes such an integral step in the interstate movement of passenger traffic as to be considered as being in interstate commerce, nor that any unfair labor practices whether by the union or the Yellow Cab system burden or obstruct interstate commerce. For this reason the superior court was in error in holding that the jurisdiction of this case lies with the National Labor Relations Board.

For the consideration of the jurisdictional issue here presented, we have accepted the union's hypothesis that the relator and the one hundred eighteen operating corporations constitute a system that can be treated as an entity. If it is such an entity, a matter which we do not decide, we hold that there is no unfair labor practice here involved which affects or burdens interstate commerce.

The writ of mandate is hereby granted directing the superior court of King county to take jurisdiction of relator's suit for injunctive relief.

ALL CONCUR.