EVANSTON CAB CO., Skokie Red Top Cab Co., and Lincolnwood Red Top Cab Co., Illinois corporations, Plaintiffs-Appellants,

v.

CITY OF CHICAGO, a municipal corporation, et al., Defendants-Appellees.

No. 14201.

United States Court of Appeals Seventh Circuit.

Dec. 18, 1963.

counsel), Sherman Dickholtz, Chicago, Ill., for appellee.

Before HASTINGS, Chief Judge, and SCHNACKENBERG and SWYGERT, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

Evanston Cab Co., Skokie Red Top Cab Co., and Lincolnwood Red Top Cab Co., Illinois corporations, plaintiffs, brought an action against the City of Chicago, a municipal corporation, defendant, and the other defendants above-named, in the district court, under the Clayton Act, 15 U.S.C.A. §§ 15, 26, and the Sherman Act, 15 U.S.C.A. §§ 1, 2.

On motion of defendants, the action was dismissed at plaintiffs' costs. This appeal followed.[1]

The relevant facts as shown by the pleadings we set out in condensed form.

Chicago-O'Hare International Airport is an airport owned by the defendant City of Chicago and is the primary scheduled airline airport for the Chicago Metropolitan area consisting of the counties of Cook, Lake, DuPage, McHenry, Kane and Will, in the state of Illinois, and the counties of Lake and Porter in the state of Indiana. O'Hare is twenty-three miles from downtown Chicago and until March 28, 1956 was not within the incorporated area of the City of Chicago. On that date it was annexed to the city. Physically it is completely separated from the rest of the corporate area of the city except for a connecting strip of Higgins Road and East River Road. All but a very small portion of passengers arriving at O'Hare in scheduled airline planes originate their flights outside the State of Illinois.

Plaintiffs are respectively engaged in the operation of taxicabs in the municipalities of Evanston, Skokie and Lincolnwood, in suburban Cook County.

The complaint alleges that 6,700,000 persons live in the Chicago metropolitan

Jason Ernest Bellows, Charles A. Bellows, Sherman C. Magidson, Chicago, Ill., for plaintiffs-appellants.

Alfred W. Bosworth, Alfred W. Israelstam, Manuel J. Finkel, William C. Wines, Julius Jesmer, John C. Melaniphy, Corp. Counsel, Robert J. Collins, Asst. Corp. Counsel, Chicago, Ill. (Sydney R. Drebin, Asst. Corp. Counsel, of

1. The last four defendants named are respectively the following officials of the City of Chicago: corporation counsel, public vehicle license commissioner, aide to the mayor, and a police officer assigned to duty in the office of the Public Vehicle License Commissioner.

area and that all persons completing flights at O'Hare *engage* some form of *further* transportation to take them to their ultimate destination in the Chicago Metropolitan Area. To provide this further transportation the Chicago Helicopter airways has scheduled flights between O'Hare, Midway Airport, downtown Chicago, Gary, Indiana and Winnetka, Illinois. All other public transportation in interstate commerce of persons completing flights at O'Hare to their final destinations in the Chicago Metropolitan Area is by taxicab.[2]

The complaint charges that defendant taxicab concerns and other defendants conspired among themselves and with others to eliminate and restrict competition in the providing of taxicab service at O'Hare, by ratifying a prior prohibition of the plaintiffs from providing taxicab service to persons traveling in interstate commerce completing their flights at O'Hare, and by agreeing to prohibit all persons from providing such service in the regular taxi line except the cab company defendants and other taxicabs licensed by the City of Chicago, and further agreed to permit the plaintiffs to render taxi service at O'Hare only when specifically contracted for by letter, telegram or telephone prior to rendering such service, thus placing the plaintiffs at a distinct competitive disadvantage.

The complaint further charges that the city council of defendant city enacted an ordinance effectuating said agreements and that it and certain other ordinances, copies of which are attached to the complaint, which limit plaintiffs in providing taxi service at O'Hare, are therefore unreasonable, discriminatory and deprive plaintiffs of their property without due process of law, contrary to the fourteenth amendment to the constitution of the United States.

The complaint further charges that the conspiracy and ordinance "actually restrain, burden and monopolize interstate commerce".

Plaintiffs seek recovery of damages for losses sustained by reason of the facts charged, relying on §§ 4 and 16 of the Clayton Act, 15 U.S.C.A. §§ 15, 26, and §§ 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1, 2.

■ 1. The United States Supreme Court has made clear that local operations of taxicabs, such as those involved in this case, do not constitute a part of interstate commerce within the meaning of the Sherman Act. United States v. Yellow Cab, 332 U.S. 218, 230, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947), which we relied upon in Parmelee Transportation Company v. Keeshin, 292 F.2d 794 (7 Cir., 1961), cert. den. 368 U.S. 944, 82 S.Ct. 376, 7 L.Ed.2d 340.

In Yellow Cab, 332 U.S. at 230, 67 S.Ct. at 1566–1567, 91 L.Ed. 2010, the court said:

"Finally, it is said that the appellees have conspired to control the principal taxicab operating companies in Chicago and to exclude others from engaging in the transportation of interstate travelers to and from Chicago railroad stations. To that end, they have conspired to induce the City of Chicago to limit the number of licensed taxicabs to 3,000, to hold 2,595 (or 86%) of these licenses themselves, to obtain for Yellow and Checker any licenses above 3,000 which the city might later issue, and to prevent new operators from entering the cab business in Chicago by having Yellow and Checker annually renew licenses for cabs which they do not operate and have no intention of operating."

Then, answering the contention that the passengers in the taxicabs there involved were being transported in interstate commerce, the court added:

"The interstate commerce toward which this aspect of the conspiracy is directed is claimed to arise out of the following facts. Many per-

2. In addition Continental Air Transport Co., Inc., operates bus service between O'Hare, Midway Airport, downtown Chi-
cago, Evanston, Illinois and Oak Park, Illinois.

sons are said to embark upon interstate journeys from their homes, offices and hotels in Chicago by using taxicabs to transport themselves and their luggage to railroad stations in Chicago. Conversely, in making journeys from other states to homes, offices and hotels in Chicago, many persons are said to complete such trips by using taxicabs to transport themselves and their luggage from railroad stations in Chicago to said homes, offices and hotels. Such transportation of persons and their luggage is intermingled with the admittedly local operations of the Chicago taxicabs. But it is that allegedly interstate part of the business upon which rests the validity of the complaint in this particular.

"We hold, however, that such transportation is too unrelated to interstate commerce to constitute a part thereof within the meaning of the Sherman Act. These taxicabs, in transporting passengers and their luggage to and from Chicago railroad stations, admittedly cross no state lines; by ordinance, their service is confined to transportation 'between any two points within the corporate limits of the city.' None of them serves only railroad passengers, all of them being required to serve 'every person' within the limits of Chicago. They have no contractual or other arrangement with the interstate railroads. Nor are their fares paid or collected as part of the railroad fares. In short, their relationship to interstate transit is only casual and incidental."

Further stating its reasons, the court, 332 U.S. at 231, 67 S.Ct. at 1567, 91 L.Ed. 2010, said:

"Here we believe that the common understanding is that a traveler intending to make an interstate rail journey begins his interstate movement when he boards the train at the station and that his journey ends when he disembarks at the station in the city of destination. What happens prior or subsequent to that rail journey, at least in the absence of some special arrangement, is not a constituent part of the interstate movement. The traveler has complete freedom to arrive at or leave the station by taxicab, trolley, bus, subway, elevated train, private automobile, his own two legs, or various other means of conveyance. Taxicab service is thus but one of many that may be used. It is contracted for independently of the railroad journey and may be utilized whenever the traveler so desires. From the standpoints of time and continuity, the taxicab trip may be quite distinct and separate from the interstate journey. To the taxicab driver, it is just another local fare."

Plaintiffs purport to see a departure from the ruling in Yellow Cab, when they cite United States v. Employing Plasterers Association, 347 U.S. 186, 74 S.Ct. 452, 98 L.Ed. 618 (1954) and United States v. Employing Lathers Association, 347 U.S. 198, 74 S.Ct. 455, 98 L.Ed. 627 (1954). We see none. In Plasterers, 347 U.S. at 189, 74 S.Ct. at 454, 98 L.Ed. 618, Mr. Justice Black pointed out that there

"* * * a local group of people were to a large extent able to dictate who could and who could not buy plastering materials that had to reach Illinois through interstate trade if they reached there at all. Under such circumstances it goes too far to say that the Government could not possibly produce enough evidence to show that these local restraints caused unreasonable burdens on the free and uninterrupted flow of plastering materials *into* Illinois. That wholly local business restraints can produce the effects condemned by the Sherman Act is no longer open to question. * * *" (Italics supplied.)

In Lathers, the same justice quoted the course taken by lathing material

produced in states other than Illinois and shipped interstate to Chicago, Illinois and finally delivered by a plastering contractor to his lathing contractor for use on local building jobs. The alleged conspiracy was among these contractors and the union whose members did the actual lathing. The court, 347 U.S. at 200, 74 S.Ct. at 456, 98 L.Ed. 627, said:

> "The complaint charges that an effect of the alleged combination and conspiracy has been that '[i]nterstate trade and commerce in lathing and related building materials has been unlawfully restrained.' Other allegations emphasize this charge by asserting that any restraint upon lathing work in Chicago 'necessarily and directly restrains and affects the interstate flow of lathing materials, and * * * building materials * * *.'
>
> "The complaint does state a cause of action * * *."

In the case at bar no commodity shipped in interstate commerce is involved and the Plasterers and Lathers cases are not applicable.

Plaintiffs would accomplish the "extinction" of Yellow Cab as authority by a process of reasoning which we shall attempt to condense.

They refer to a 1960 per curiam order of the Supreme Court of the United States, Superior Ct. of State of Wash. for King County v. State of Wash. ex rel. Yellow Cab Service, 361 U.S. 373, 80 S.Ct. 400, 4 L.Ed.2d 380, which reversed, on the authority of San Diego Building Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), an order of the Supreme Court of Washington, in State of Washington ex rel. Yellow Cab Service, Inc. v. International Brotherhood of Teamsters, etc., and Superior Court of the State of Washington for King County, 53 Wash.2d 644, 333 P.2d 924 (1959).

By plaintiffs' brief herein, our attention is called to the fact that the Superior Court for King County, Washington, had been asked by Yellow Cab Service, Inc.

to enjoin *picketing* of its premises by a *union*. The Superior Court refused injunctive relief because Yellow Cab Service was in interstate commerce and the case presented a labor dispute affecting interstate commerce over which the National Labor Relations Board would have jurisdiction. The Superior Court relied on Guss v. Utah Labor Relations Board, 353 U.S. 1, 77 S.Ct. 598, 1 L.Ed.2d 601 (1957).

However, the Washington Supreme Court, on application for writ of mandate, considered Yellow Cab controlling and said that while Yellow Cab was decided under the Sherman Act, it was nonetheless an authority in the labor case before it.

It reasoned as follows, 333 P.2d at 928:

> "We do not believe that whatever unfair labor practice may be present in this case can possibly be said to be 'burdening or obstructing commerce' (see 49 Stat. 450, 29 U.S. C.A. § 152(7), * * *). There is no testimony in the record that this strike has impaired taxicab service to or from the railroad terminals, airports, and docks, and hence no evidence of any effect upon interstate commerce sufficient to justify the application of the National Labor Relations Act. United States v. Yellow Cab Co., supra. No such circumstance is present in this case."

It thereupon directed the Superior Court to take jurisdiction of relator's suit for injunctive relief. It was this action that the United States Supreme Court reversed by its 1960 per curiam order.

The Garmon case is one of a series of cases in which the Supreme Court of the United States was faced with the problems created by the failure of the National Labor Relations Board to take jurisdiction in labor disputes in industries which affect interstate commerce. The broad scope of the National Labor Relations Act which encompassed the State of Washington case is reflected

by the definitions in § 2 of that act, 29 U.S.C.A. § 152. The term "commerce" is defined as meaning "trade, traffic, commerce, transportation, or communication among the several States", while the term "affecting commerce" means "in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce."

The term "labor dispute" is defined as including "any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee."

In Garmon,[3] as well as in State of Washington, labor disputes were involved. In the case at bar, no labor dispute was involved and there is no contention that there was. No one is insisting that the National Labor Relations Board would have had any jurisdiction of the matter now before this court or that the Board's jurisdiction would have been invaded or affected by the action of this court or the district court. Moreover, no dispute exists in regard to any commodity moving in interstate commerce or which has or is about to enter into interstate commerce. No basis in fact or law appears to justify us in ignoring the persuasiveness of the reasoning and holding in Yellow Cab.

The passenger who enters a cab at O'Hare field or who leaves a cab at O'Hare field is furnished a service. Neither the owner of the cab nor the driver thereof crosses any state line. Nothing about the service affects interstate commerce. The service is incidental to a local operation and we would not be justified in resorting to impractical theorizing in order to conclude that a local ride in a local taxicab affects interstate commerce.

2. Plaintiffs contend that defendants entered into a conspiracy to restrain trade, and that, the city, in pursuance thereof, passed the Chicago taxicab licensing ordinance, which is invalid, as a violation of the due process and equal protection clauses of the fourteenth amendment to the constitution of the United States as well as the privileges and immunities granted by article IV and the fourteenth amendment of said constitution, in that said ordinance makes an arbitrary and unreasonable discrimination against a corporation by requiring it, when applying for public passenger vehicle licenses, to have its principal place of business within the city of Chicago.

In City of Chicago v. Vokes, et al., 28 Ill.2d 475, 193 N.E.2d 40 (1963), the Illinois Supreme Court reviewed convictions of certain taxicab drivers, charged with transporting passengers for hire without a proper license. Defendants there were employed by either Evanston Cab Company or Skokie Red Top Cab Company, also named as plaintiffs herein. They were charged with violating § 28-2 of the Chicago municipal code relating to public passenger vehicles, which makes it unlawful "for any person other than a metropolitan transit authority or public utility to operate a motor vehicle for the transportation of passengers for hire unless the vehicle is licensed by the city of Chicago as a public passenger vehicle." § 28-3 provides "Nothing in this chapter shall be construed to prohibit any public passenger vehicle from coming into the city to discharge passengers accepted for transportation outside the city. * * * No person shall be solicited or accepted in said vehicle for transportation from any place within the city. * * * "

---

**3.** In Retail Clerks International Ass'n, Local 1625, A.F.L.–C.I.O. v. Schermerhorn, 375 U.S. 96, 84 S.Ct. 219, 11 L.Ed.2d 179, the court said in respect to Garmon.

" * * * it merely rationalizes the problems of coexistence between federal and state regulatory schemes in the field of labor relations; * * *."

§ 28–5.1, relating to licensing applications, provides that all "corporate applicants shall be organized or qualified to do business under the laws of Illinois and have their principal places of business in the city of Chicago".

The court pointed out, 28 Ill.2d at 477, 193 N.E.2d 40, that the ordinance provides that licenses must be applied for annually and that the commissioner of public vehicles should investigate the character and financial ability of the applicant to render safe and comfortable transportation service, to maintain or replace the equipment for such service and to pay all judgments and awards which may be rendered for any cause arising out of the operation of a public passenger vehicle during the license period.

The Illinois Supreme Court met the challenges to the constitutionality of the ordinance, including the ground now under consideration by us, by holding that the requirement that a corporate licensee have its principal place of business in the city is not so oppressive nor unreasonable as to render it vulnerable to the constitutional attack there made upon it, which has been repeated by plaintiffs in the case at bar.

The court said, 28 Ill.2d at 480, 193 N.E.2d at 44:

"By its very nature the taxicab industry directly and substantially provokes considerations of public safety and welfare. Its vehicles are constantly on the city streets, day and night, and the members of the public who utilize them must place almost a blind trust in the fitness of their equipment and the competence of their drivers. Thus, not only does the operation of the business call for measures to protect others using the streets and highways, but also for regulations which insure the highest degree of safety for its passengers. * * *

"If corporations licensed to operate taxis in the city of Chicago have no place of business there and do not maintain their records or equipment there, the functions of investigation, inspection and supervision required in the public interest would be exceedingly difficult if not impossible to completely and adequately perform. This is particularly true when we consider the vast number of suburban towns and villages encircling the city, and the circumstances that Chicago investigators and inspectors, once outside the territorial limits of the city, would be without authority to act or to require compliance with the ordinances involved. * * *

"Further, it is also in the public interest to have the corporate officers and records available locally in the event of complaints, loss or litigation. * * * "

We agree with the aforesaid reasoning and holdings of the Illinois court in Vokes.

■■ We find that the ordinance was enacted in the exercise of the city's wide scope of discretion in the adoption of police laws and is not without any reasonable basis and therefore arbitrary. One who assails a classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary. Morey v. Doud, 354 U.S. 457, 463–464, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957). Plaintiffs have failed to sustain their burden.

We hold that the ordinance now under attack is not subject to the infirmities charged against it by plaintiffs and that, therefore, there is no basis set forth in the complaint for holding in favor of plaintiffs on the constitutional grounds urged.

3.. In view of what we have held, it is unnecessary to discuss other points raised in plaintiffs' brief in this court.

For the reasons which we have stated, the order of the district court dismissing plaintiffs' cause is affirmed.

Order affirmed.