The **NATIONAL FOUNDATION,**
a Corporation

v.

**CITY OF FORT WORTH, TEXAS,**
a Municipal Corporation.

No. CA 4–800.

United States District Court
N. D. Texas,
Fort Worth Division.

Nov. 30, 1967.

on the streets and in public places in such city.

The defendant's challenge of jurisdiction raises a serious question. The complaint says only that the Court has jurisdiction under Title 49 U.S.C.A. § 1983 (the plaintiff obviously meant Title 42), and also under Title 28 U.S. C.A., § 1343(3), "and with respect to declaratory judgment sought herein has jurisdiction under Title 28 U.S.C.A. § 2201." Even if plaintiff otherwise comes within the civil rights statutes, its complaint fails to show that it is being denied any right, privilege or immunity secured by the Constitution of the United States or by any act of Congress providing for equal rights of all persons within the jurisdiction of the United States. There is no constitutional right to make public solicitation of funds for charity, and such public solicitations are subject to the police power of the state where made. Cantwell v. State of Connecticut, 310 U.S. 296, 305, 306–307, 60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352 (1940); American Cancer Society v. City of Dayton, 160 Ohio St. 114, 114 N.E.2d 219, 224 (1953); Gospel Army v. City of Los Angeles, 27 Cal.2d 232, 163 P.2d 704, 712–713 (1945); Ex Parte Williams, 345 Mo. 1121, 139 S.W.2d 485, 488 (1940), cert. den. 311 U.S. 675, 61 S.Ct. 42, 85 L. Ed. 434; Ex Parte White, 56 Okl.Cr. 418, 41 P.2d 488, 490 (1935). The declaratory judgment statute is not a jurisdictional act. It provides only a remedy in cases in which the court has jurisdiction from other sources. Jurisdiction of this case can hang only on the slender thread created by the allegation that the exception in Chapter 32 exempting churches and fraternal organizations soliciting "funds for its own use solely from its own members" is a discriminatory classification resulting in a denial to the plaintiff of equal protection of the laws guaranteed by the fourteenth amendment of the federal constitution. While the Court is of the opinion that, for reasons hereinafter discussed, Chap-

Stephen V. Ryan, Jr., New York City, Brown, Herman, Scott, Young & Dean, by Wm. M. Brown, Fort Worth, Tex., for plaintiff.

S. G. Johndroe, Jr., Jerome H. Parker, Jr., Fort Worth, Tex., for defendant.

## OPINION

BREWSTER, District Judge.

The plaintiff brings this action seeking judgment declaring unconstitutional Chapter 32 of the Code of the City of Fort Worth, Texas, which regulates the solicitations of charitable contributions

ter 32,[1] attached as an exhibit to the plaintiff's complaint, shows on its face that there was no such unconstitutional discrimination, it will, in view of the importance of getting the question decided, assume jurisdiction on the basis of this particular allegation and get to the merits of the case.

At a hearing set for consideration of motions for summary judgment filed respectively by each of the parties, and for pre-trial if both of such motions should be overruled, all counsel agreed that the only question in the case was the constitutionality of Chapter 32 of the City Code, and that the decision of such matter under the pleadings here involved only issues of law and not of fact. It was conceded that one side or the other was entitled to a summary judgment, and the case was submitted to the Court on that basis. After thorough consideration of all matters on file relevant to such motions and of the able briefs filed by each of the parties, the Court has concluded that summary judgment should be entered in favor of the defendant.

1. Chapter 32, in its entirety, is an exhibit to the plaintiff's complaint. The provisions copied in this footnote are the ones the Court considered material to the decision of this case.

"Sec. 32–3—Permit—Required.

"It shall be unlawful for any person, organization, society, association or corporation, or for any agent, member or representative thereof, to solicit property or financial assistance of any kind, to sell or offer to sell any article, tag, service, emblem, publication, ticket, advertisement, subscription, or any thing of value on the plea or representation that such sale or solicitation, or the proceeds therefrom, are for a charitable, educational, religious, patriotic or philanthropic purpose, on the streets, in any office building or any other public or private place, by house to house canvas, or by telephone in the city unless such person, organization, society, association or corporation shall have first obtained a permit in compliance with the terms of this chapter, provided, however, that the provisions shall not apply to:

"(a) Any church congregation, religious society, sect, group or order which solicits funds for its own use solely from its own members or from its own congregation; and

"(b) Any fraternal, social, partriotic, cultural or educational organization which solicits funds solely from its own members or from its own assemblies. (Ord. No. 4753, #1; Ord. No. 4758, #1)."

"Sec. 32–5. Same—Investigation; conditions of approval; certification to city secretary.

"Upon receipt of an application as provided in section 32–4, the charitable solicitations commission shall make or cause to be made such investigation as shall by the commission be deemed necessary in regard thereto. As a result of its investigation and action the commission may certify to the city secretary its approval to issue a permit, provided all other provisions of this chapter are complied with and unless one or more of the following facts are found to exist:

"(a) That one or more of the statements made in the application is not true;

"(b) That the applicant is not a responsible person of good character and reputation for honesty and integrity, or if the applicant is not an individual person, that any officer or agent of the applicant is not a responsible person of good character and reputation for honesty and integrity;

"(c) That the control and supervision of solicitations on behalf of the applicant will not be under responsible and reliable persons;

"(d) That the applicant is or has engaged in a fraudulent transaction or enterprise;

"(e) That a solicitation on behalf of the applicant would be a fraud upon the public;

"(f) That the cost of solicitation for a charitable purpose in the city during any of the three years immediately preceding the date of application has been excessive in relation to the gross amount raised;

"(g) That the expected cost of solicitation will be excessive in relation to the expected gross amount to be raised. Any such cost in excess of twenty per cent of the amount collected shall be deemed to be unreasonable unless special facts or circumstances are presented showing that a cost higher than twenty per cent is not unreasonable.

"(h) That such solicitation will be incompatible with the protection of the health, life, property, safety, welfare or morals of the citizens of the city. (Ord. No. 4753, #6; Ord. No. 4768, #4)."

Plaintiff, The National Foundation, is chartered by New York as a non-profit, charitable corporation, and has a permit to do business in Texas. The defendant is a home rule city, with all the powers given it as such by the constitution and statutes, of Texas. Art. 11, Sec. 5, Constitution of Texas, Vernon's Ann.St.; Title 28, Ch. 13 (Arts. 1165–1182f) Vernon's Ann.Tex.Civil Statutes.

Plaintiff was formerly the National Foundation for Infantile Paralysis, Inc. At about the time it became apparent that its well-known heroic fight against infantile paralysis was successful, it amended its charter so as to change its name and broaden the scope of its activities to include not only infantile paralysis, but also any phase of any disease affecting human beings. Its fund raising activities included the annual "March of Dimes" campaign on the downtown public streets of cities over the nation. Paragraphs 5 and 6 of the complaint give the following succinct description of the nature of that campaign:

"5.

"The charitable work performed by Plaintiff is in part based upon the efforts of local unincorporated units of Plaintiff called 'Chapters' which are assigned geographical territories and are responsible for the activities of Plaintiff within that territory. Each chapter receives a certificate or recognition from the Plaintiff; each chapter is an integral part of Plaintiff; and each chapter is subject at all times to the rules, regulations, and policies of Plaintiff. The Tarrant County Chapter of the Plaintiff, the territory of which includes the City of Fort Worth, was organized on May 6, 1940.

"6.

"For many years past the Plaintiff and its local chapters, including the Tarrant County Chapter, have conducted an annual fund-raising appeal on both a national and local scale (entitled and hereinafter called the 'March of Dimes') to raise funds through charitable contributions to support the activities of Plaintiff and its local chapters. The 'March of Dimes' is directed by Plaintiff in accordance with nationally developed plans, and, except for special campaigns of Plaintiff, no chapter may engage in any fund-raising activities other than the 'March of Dimes.' In each year the 'March of Dimes' is conducted during the month of January, and is keyed to a national publicity campaign through the *voluntary* cooperation and assistance of radio and television networks and stations that broadcast announcements and requests urging all listeners to contribute to the 'March of Dimes' and through the *voluntary* cooperation and assistance of other media of public communication on the national and local level. Locally, the chapters organize *volunteer* workers in the various communities in their respective territories to publicize the 'March of Dimes' and solicit contributions. The work undertaken by such *voluntary* workers in their respective communities includes the distribution of advertising posters appealing for contributions, mail solicitation, collections made through deposit in coin containers installed by such *volunteer* workers in various public places and commercial establishments, solicitation on public streets and from house to house, and various other methods." (Emphasis added)

It will later appear more fully that the only ground upon which the City denied the plaintiff a permit to make its annual solicitations was that the cost of its solicitations exceeded the twenty per cent limit provided by Chapter 32, without a proper showing, as required by such Chapter, that such excess was reasonable and necessary. Under plaintiff's own audit available at the City's hearing on its application for a permit, its fund raising costs in Fort Worth had exceeded one-third of the amount raised in the City for each of the two years past. When the City applied the same standards to it as were applied to other charitable organizations applying for

permits, the fund raising cost exceeded fifty per cent. This was in spite of the fact that, according to the allegations of plaintiff's own complaint, *most of the fund raising work was done by voluntary workers and that the publicity by the news media was also on a voluntary basis.*

Chapter 32 was enacted in 1937, and has been consistently enforced by the City of Fort Worth since that time. The American Heart Association, the American Cancer Society, the National Arthritis Foundation, the National Council on Alcoholism, and all other charitable organizations have willingly complied with it. There is no indication that any of them ever objected to the twenty per cent provision or to furnishing the information of their financial operations necessary to enable the City to determine that the solicitations were in fact primarily for charity rather than for large administrative salaries. The plaintiff also willingly complied with it until its administrative expenses took a substantial jump. In spite of that fact, the City gave plaintiff two years of grace before it finally made it clear that even plaintiff was not above the City Code. Even then, it appeared that the plaintiff was going to take advantage of the plenary public hearing before the City Council to show that the excess over the twenty per cent was reasonable. It was only when inquiry was made as to the salaries of its top officials that plaintiff clammed up and took a position which, if adopted, would mean that any person or organization would have the unbridled privilege of soliciting funds in the name of charity, without any risk of being called upon to show even in the most general way how much of the money raised actually went for the public and how much went for administrative expense. It does not take much imagination to envision what would happen if the gates were thrown wide open for solicitations on the streets and in public places by all comers in the name of charity. The injury to the public would be tremendous, but the bona fide charitable organizations would be hurt, too. The public would be over solicited, and a person wishing to make a donation would have no way of knowing the bona fide charities from the predators.

Nothing said herein is intended to reflect upon the plaintiff organization. No one realizes better than a parent who has suffered the agony of seeing his own child stricken by polio what a great contribution the plaintiff made in the conquest of that crippling disease. Even that outstanding work, however, does not justify the present organization in increasing its administrative expense to the point where it is unwilling even to make an effort to show that it is reasonable. It must be borne in mind, too, that if the plaintiff is allowed to make public solicitations, without any permit issued under reasonable regulations, that same privilege must be accorded all others, including those who do not have the background of the plaintiff, or any background at all.

The more detailed findings and conclusions that follow support the general observations above.

The plaintiff's complaint alleges that Chapter 32 violates its constitutional rights in each of the following respects:

"1) It violates Plaintiff's right of free press and free speech, in violation of Article I and Section 1 of Article XIV of Amendments to the Constitution of the United States.

"2) It violates Plaintiff's right not to be deprived of liberty or property without due process of law, in violation of Article V and Section 1 of Article XIV of Amendments to the Constitution of the United States.

"3) It violates Plaintiff's right to equal protection of the laws, in violation of Section 1 of Article XIV of Amendments to the Constitution of the United States.

"4) It constitutes, in its application to the Plaintiff an arbitrary exercise of the police powers of the City of Fort Worth, Texas without any proper justification of public interest and without any rea-

sonable standards of application and enforcement.

"5) It constitutes an unlawful delegation of arbitrary legislative power to an administrative body without reasonable standards for application."

The defendant contends:

(1) Plaintiff has no vested right, privilege or immunity secured by the Constitution of the United States or by any act of Congress to solicit funds upon the streets, in the public places, or by a house to house canvass.

(2) Chapter 32 does not violate the plaintiff's freedoms of speech or press.

(3) Chapter 32 does not deprive the plaintiff of liberty or any property interest without due process of law.

(4) Chapter 32 and the regulation of solicitation of charitable contributions is a valid exercise of the police power of the City of Fort Worth as a home-rule city, and that as such the legislature of the State of Texas has vested it with absolute domain, control and jurisdiction over its public streets.

(5) In the alternative, if any part of Chapter 32 is found to be unconstitutional or invalid, then under the general severability clause of Chapter 1, Section 1-4 of the City Code, such unconstitutional part should be severed and the remainder of the ordinance upheld.

Since its inception, plaintiff's Tarrant County Chapter has received the benefits of and conducted each of its annual solicitation campaigns under provisions of Chapter 32 of the City Code of Fort Worth. The detailed facts leading up to this litigation may be summarized as follows:

On November 3, 1964, the Tarrant County Chapter of the National Foundation (March of Dimes) submitted an application to the Charitable Solicitations Commission of the City of Fort Worth for a permit to solicit funds on the public streets and in public places in the City of Fort Worth in the month of January, 1965. This application was considered at a regular, public meeting of the Charitable Solicitations Commission; and thereafter, on January 13, 1965, the Commission wrote a letter to the Secretary of the local chapter that its application for permit had been granted. However, in said letter notice was given that the costs of solicitation for the previous year had exceeded appreciably the twenty per cent limitation set by ordinances of the City of Fort Worth and that the Commission had "no alternative but to deny future permits should this condition persist."

On January 20, 1965, the Tarrant County Chapter of the National Foundation wrote a letter to Roy A. Bateman, as Secretary Ex-Officio of the Charitable Solicitations Commission of the City of Fort Worth, acknowledging receipt of the Commission's letter dated January 13, 1965, and requesting a detailed analysis or statement indicating that the previous year's fund raising expense exceeded twenty per cent.

On February 17, 1965, Mr. R. F. Snakard, Chairman of the Charitable Solicitations Commission of the City of Fort Worth, wrote a letter to the Executive Director of the Tarrant County Chapter of The National Foundation, in which he furnished the requested detailed analysis and statement showing that the solicitation expenses of The National Foundation exceeded twenty per cent.

On October 19, 1966, The National Foundation filed with Roy A. Bateman, the City Secretary of the City of Fort Worth, an application for a permit to conduct a solicitations campaign, known as the "March of Dimes", in the city of Fort Worth between the dates of December 15, 1966 and March 15, 1967. At its next regular meeting on November 22, 1966, the Charitable Solicitations Commission considered said application and the accompanying evidence submitted by The National Foundation. Based upon its findings that the solicitation expenses exceeded the twenty per cent limit allowed by the City ordinance, the Commission decided to withhold the granting of a permit. On the same day, the Charitable Solicitations Commission wrote a letter to the Tarrant County Chapter of

The National Foundation notifying it of the decision of the Commission and allowing it an opportunity to present additional information.

Thereafter, on December 13, 1966, the Charitable Solicitations Commission again considered the application of The National Foundation in an open, public meeting, which was attended by representatives of both the national headquarters and the local chapter; and, after further consideration, the Commission reaffirmed its decision to withhold the granting of a permit.

On December 15, 1966, The National Foundation wrote a letter to the City Council of the City of Fort Worth, exercising its right to appeal from the decision of the Charitable Solicitations Commission in withholding the granting of a permit and applying for a hearing before that body.

The application of The National Foundation for a permit to conduct a charitable solicitations campaign in the City of Fort Worth between the dates of December 15, 1966 and March 15, 1967 was heard de novo by the City Council at its regular, open, public meeting held in the Council Chamber at the City Hall in the City of Fort Worth, Texas, on December 27, 1966. The National Foundation appeared at said hearing through its attorneys and through officers of the national headquarters and the local chapter and presented testimony and exhibits in support of its application. Members of the City Council interrogated the officials of The National Foundation concerning *the annual salary and retainer fee paid to the President of The National Foundation, and this information was refused.* The evidence presented by The National Foundation and by members of the Charitable Solicitations Commission concerned the issue as to whether the cost of solicitation by The National Foundation for charitable purposes in the City of Fort Worth during any of the three years immediately preceding the date of application exceeded twenty per cent of the amount collected. A full hearing of the appeal

of The National Foundation was held by the City Council of the City of Fort Worth at which all interested persons were permitted to testify at length. The hearing commenced at approximately 10:00 A.M. on December 27, 1966, and continued until 12:30 P.M. It was resumed at 1:30 P.M. and was concluded after 3:00 P.M.

Mr. Marcus Ginsburg, a member of a prominent Fort Worth law firm, testified in part that he was a member of the Charitable Solicitations Commission of the City of Fort Worth, and that in its hearings on November 22, 1966 and December 13, 1966, concerning the application of The National Foundation, the Commission considered, among other evidence, certified audit reports of the national headquarters and of the local chapter.

A recapitulation of the facts and figures of Mr. Ginsburg's testimony concerning plaintiff's certified audit reports was placed on the blackboard in the Council Chamber in full view of all persons present. Such recapitulation was as follows:

| | |
|---|---|
| Total Receipts | $60,938 |
| 20% Limitation | $12,187 |
| Admitted Fund-Raising Expense | $ 9,847 |
| ½ Chapter Operating Expense | 5,060 |
| Sub-total | $14,907 |
| ½ Local Director's Salary | $ 4,750 |
| Sub-total | $19,757 |
| 0.3% of Admitted National Fund-Raising Expense | 2,069 |
| Total Local Fund-Raising Expense | $21,827 |

Mr. Ginsburg referred specifically to the figures on the blackboard which showed that the amount of fund-raising expense chargeable locally was not less than $21,827.00, which was greatly in

excess of twenty per cent of the amount collected. Mr. Ginsburg further stated that there was at least an additional $10,000.00 of National expense which had been improperly allocated and which should have been charged to local fund-raising expense. He pointed out that this additional $10,000.00 would increase the local fund-raising expense to approximately $31,000.00—more than one-half of the amount collected.

After all interested persons had presented their evidence and expressed their views, the City Council considered a motion that it grant to The National Foundation a permit to solicit in the City of Fort Worth for its 1966–67 campaign only, which motion failed to pass.

On January 10, 1967, following the unsuccessful appeal to the City Council, plaintiff brought suit in the 153rd Judicial District Court of Tarrant County, Texas, seeking an injunction to prohibit the City of Fort Worth from enforcing the penal provisions of Chapter 32 of the City Code of Fort Worth against its agents, employees or solicitors. On the same day, the Hon. Harold Craik, Judge of said court, rendered an order enjoining the defendant from enforcing the penal provisions of Chapter 32 against the plaintiff.

On January 12, 1967, the City of Fort Worth and the members of the City Council filed a petition for writ of mandamus in the Supreme Court of Texas, requesting that Court to dissolve the injunction which had been issued.

On January 13, 1967, the Supreme Court of Texas ordered the injunction entered by Judge Craik dissolved; and in its opinoin published as City of Fort Worth v. Craik, Tex.S.Ct., 411 S.W.2d 541 (1967), the Court said at pp. 542-543:

"* * * 'The constitutionality or validity of a penal ordinance is a question ordinarily within the exclusive jurisdiction of courts exercising criminal jurisdiction. However, courts of equity may enjoin the enforcement of a penal ordinance where the

ordinance is unconsitutional and void, and its enforcement will result in irreparable injury to vested property rights.' (cases cited).

"The privilege of soliciting funds for charitable purposes upon the streets in public places or by house to house canvas cannot be properly classified as a vested property right. * * *

" * * * The validity of the present ordinance may, of course, be tested in the criminal courts and it is unnecessary for us and we do not pass upon the validity of such ordinance here. Our holding is that a court of equity will not determine originally the validity of a criminal regulation in the absence of a showing of irreparable injury to vested property rights. That showing was not made in this case."

The complaint in the instant case was then filed on March 13, 1967; and following joinder of issue, the case was submitted to the Court on motions for summary judgment under the circumstances heretofore mentioned. The transcript and instruments introduced in the proceedings before the City Council, as well as the affidavit filed in support of defendant's motion for summary judgment are before the Court along with the pleadings and briefs.

At the outset, it is obvious from the files, records, and transcript below that the municipal proceedings satisfied even the requirements of procedural due process set out in Hornsby v. Allen, 5 Cir., 326 F.2d 605 (1964), reh. den. 330 F.2d 55. While the standards laid down in that case are strict, there was no intention to put cities in straight-jackets and to reduce their officials to the status of automatons. To do so would deprive cities of their police powers so necessary to protect their citizens. The purpose of that case was to insure that municipal authorities act in a reasonable rather than an arbitrary manner. There is no indication in it that any municipality would be required to adopt a blue print anticipating the minute details of any

situation that might arise. From 1964, the plaintiff was put on notice of a definite standard applied by the City of Fort Worth and the members of the Charitable Solicitations Committee; that is, that a permit to solicit funds for an alleged charitable purpose would not be issued if the cost of solicitation should be excessive in relation to the gross amount raised, and the cost of solicitation would be deemed excessive and unreasonable if it should exceed twenty per cent of the amount collected. The notice letter was clear as to the twenty per cent standard, and it was clear as to the analysis used by the Commission. Plaintiff's satisfaction of any of the other qualifying criteria of the statute was not questioned. The standard to be met was definite, and it remained certain throughout the hearings before the Commission and the City Council.

The twenty per cent standard was the only issue before the City Council on appeal from the Commission's decision. At that time plaintiff had the opportunity to present evidence showing that the cost higher than twenty per cent was not unreasonable. It presented only its annual statement, which although obscure, was detailed enough to show that the twenty per cent standard was exceeded. The plaintiff was very reluctant to disclose a detailed breakdown of its annual report or any other financial data and chose to stand on its annual report. The evidence developed at the hearing before the City Council showed that in fact plaintiff had established its own accounting procedures, and felt that the accounting procedures of The National Information Bureau were prejudicial. The National Information Bureau counted among its members the American Cancer Society, the American Heart Association, the National Arthritis Foundation, the National Council on Alcoholism and virtually every major charitable foundation and corporation in the United States. While these facts are not to be taken as suggesting that meeting the above accounting procedures is a criteria to be met under the City Code of Fort Worth, or a standard demanded by the Commission, they are cumulative of the plaintiff's reluctant attitude to disclose the allocation and handling of the funds it solicits annually.

■■ It has already been mentioned that there is no constitutional right to solicit funds publicly for charity, and that charitable associations are subject to the police power of a state and may be reasonably regulated. Cantwell v. State of Connecticut; American Cancer Society v. City of Dayton, Ohio; Gospel Army v. City of Los Angeles, Cal.; Ex Parte Williams, Mo.; Ex Parte White, Okl.; all supra. A city has the right to regulate the use of its streets, and may protect its citizens from the fraud and abuse to which charitable solicitations are susceptible when in the hands of unscrupulous persons seeking personal and selfish profit. Seattle v. Rogers, 6 Wash.2d 31, 106 P.2d 598, 130 A.L.R. 1498 (1940). It is not unreasonable, as an incident to that right and as an element of that protection, that a city should be furnished with an accounting of the receipts and disbursements of the funds solicited from its streets and houses. Such would appear to be particularly reasonable in the instant case where only approximately twenty per cent of the funds solicted in plaintiff's 1966 campaign were used to benefit the territory of the Tarrant County Chapter. Of the remaining amount which was shipped to plaintiff's headquarters, it would be reasonable for the City to inquire as to what portion of that amount went to research and what portion went to solicitation expenses.

■ There was no showing by the plaintiff that the twenty per cent limitation on solicitation expenses was unreasonable. The limitation had been consistently applied for more than fifteen years. Plaintiff had operated under the ordinance and the limitation for many years. It made no complaint of its constitutionality until the Commission, after affording it two years to comply with the limitation, finally denied it a permit for

failure to comply. The fact that the plaintiff received the benefits and protections of Chapter 32 for so many years is in itself sufficient to deny to it the right to challenge its constitutionality. Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 348, 56 S.Ct. 466, 80 L.Ed. 688, 711–712 (1936); Wall v. Parrot Silver & Copper Co., 244 U.S. 407, 411–412, 37 S.Ct. 609, 61 L.Ed. 1229, 1231 (1917); St. Louis Malleable Casting Co. v. George C. Prendergast Constr. Co., 260 U.S. 469, 473, 43 S.Ct. 178, 67 L.Ed. 351, 355 (1923). However, plaintiff's suit is also defeated by other well established rules of constitutional law.

▮▮▮ Chapter 32 was enacted by the City of Fort Worth under appropriate enabling legislation granted to it as a home rule city by the State of Texas. Sections 16 and 34 of Article 1175 of the Revised Civil Statutes of Texas.[2] When an ordinance is enacted within powers which are granted to a municipality by a state, the ordinance has the effect of state law for the purpose of raising a federal constitutional question. See cases compiled in annotation, 13 A.L.R.2d 390, 399–400.

▮▮▮▮ An ordinance passed within appropriate legislative powers carries with it a presumption of reasonableness and constitutionality. City of Anchorage v. Richardson Vista Corp., 9 Cir., 242 F.2d 276, 17 Alaska 23, (1957); Seattle v. Rogers, supra, 6 Wash.2d at 35, 106 P.2d at 600, at 130 A.L.R. 1502 (1940); Standard Oil Co. v. City of Tallahassee, 5 Cir., 183 F.2d 410 (1950), cert. den. 340 U.S. 892, 71 S.Ct. 208, 95 L.Ed. 647; Mestre v. City of Atlanta, 5 Cir., 255 F.2d 401 (1958); Phenix City, Ala. v. Southern Bell Telephone & Telegraph Co., D.Ct.Ala., 33 F.Supp. 283 (1933); Tower Realty v. City of East Detroit, 6 Cir., 196 F.2d 710 (1952); McLarty v. Borough of Ramsey, 3 Cir., 270 F.2d 232 (1959). It has long been the established practice of the federal courts to present constitutional issues in their narrowest possible scope and to avoid such determinations even by strained statutory construction. Liver-

2. Article 1175, Vernon's Ann.Texas Civil Statutes states:

"16. To have exclusive dominion, control, and jurisdiction in, over and under the public streets, avenues, alleys, highways and boulevards, and public grounds of such city and to provide for the improvement of any public street, alleys, highways, avenues or boulevards by paving, raising, grading, filling or otherwise improving the same and to charge the cost of making such improvement against the abutting property, by fixing a lien against the same, and a personal charge against the owner thereof according to an assessment specially levied therefor in an amount not to exceed the special benefit any such property received in enhanced value by reason of making such improvement, and to provide for the issuance of assignable certificates covering the payments for said cost, provided that the charter shall apportion the cost to be paid by the property owners and the amount to be paid by the city, and provided, further, that all street railways, steam railways, or other railways, shall pay the cost of improving the said street between the rails and tracks of any such railway companies and for feet on each side thereof. The city shall have the power to provide for the construction and building of sidewalks and charge the entire cost of constructing of said sidewalks, including the curb, against the owner of abutting property, and to make a special charge against the owner for such cost and to provide by special assessment a lien against such property for such cost; to have the power to provide for the improvement of any such sidewalk or the construction of any such curb by penal ordinance and to declare defective sidewalks to be a public nuisance. The power herein granted for making street improvements and assessing the cost by special assessment in the manner herein stated shall not be construed to prevent any city from adopting any other method or plan for the improvement of its streets, sidewalks, alleys, curbs, or boulevards, as it may deem advisable by its charter."

"34. To enforce all ordinances necessary to protect health, life and property, and to prevent and summarily abate and remove all nuisances and to preserve and enforce the good government, order and security of the city and its inhabitants. Acts 1913, p. 307; Acts 1921, p. 169; Acts 1963, 58th Leg., p. 447, ch. 160, art. II."

188

pool, N. Y. & P.S.S. Co. v. Commissioners of Emigration, 113 U.S. 33, 39, 5 S.Ct 352, 28 L.Ed. 899, 901, (1885); Ashwander v. Tennessee Valley Authority, supra. When procedural due process is in issue, as it is in the instant case, a statute or ordinance may be valid under one state of facts and invalid under another. Kansas City Southern Ry. Co. v. Anderson, 233 U.S. 325, 329–330, 34 S.Ct. 599, 58 L.Ed. 983, 985 (1914). The Supreme Court has long considered it axiomatic " * * * never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied. * * " Liverpool N. Y. & P. S. S. Co. v. Commissioners of Emigration, supra, at 113 U.S. p. 39, 5 S.Ct. p. 355. And in that connection, the Supreme Court will consider only those very limited aspects of a statute that alone may affect the rights of the particular litigant before the Court. Muskrat v United States, 219 U.S. 346, 361–362, 31 S.Ct. 250, 55 L.Ed. 246, 251–252 (1911); cf. Commonwealth of Massachusetts v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923).

 The provisions of Chapter 32, were enacted as part of City Code of Fort Worth, under the provisions of Section 1–4 of Chapter 1,[3] which manifests the legislative intent that the various sections, paragraphs, sentences, clauses and phrases of the Code are to be considered as severable from one another, and the unconstitutionality of one part is not to be considered as affecting the remainder. Such severability provisions are considered to be an explicit expression of the legislative body, and they are given full scope and effect in both the federal courts (Williams v. Standard Oil Company, 278 U.S. 235, 49 S.Ct. 115, 73 L.Ed. 287, 60 A.L.R. 596

(1929); Champlin Refining Co. v. Corporation Commission, 286 U.S. 210, 235, 52 S.Ct. 559, 76 L.Ed. 1062, 1078 (1932); Karr v. Baldwin, D.Ct.Tex., 57 F.2d 252, 255 (1932); Texoma Natural Gas Co. v. Railroad Commission of Texas, D.Ct. Tex., 59 F.2d 750, 754 (1932), and in the courts of the State of Texas (City of Kermit v. Spruill, Tex.Civ.App., 328 S.W. 2d 219, 223 (1959), writ ref. n. r. e.; City of Fort Worth v. Atlas Enterprises, Tex.Civ.App., 311 S.W.2d 922, 924 (1958), writ ref. n. r. e.; Ex Parte Sanders, 123 Tex.Cr.R., 265, 58 S.W.2d 131 (1933); Miskell v. Termplan Incorporated of Houston, Tex.Civ.App., 381 S.W.2d 129, 131 (1964), writ ref'd.)

 A severability clause of the sort herein presented is considered to be a legislative declaration " * * * that the invalidity of any part of the act shall not in any manner affect the remaining portions. That discloses an intention to make the act divisible, and creates a presumption that, eliminating invalid parts, the Legislature would have been satisfied with what remained, and that the scheme of regulation derivable from the other provisions would have been enacted without regard to * * * (the invalid parts)." Champlin, supra, at 286 U.S., p. 235, 52 S.Ct., p. 565.

 Once the severability of a portion of an ordinance or statute which is attacked on constitutional grounds is established, one must determine whether the portion thus divorced from the rest, standing alone, can be given legal effect, or whether it is so interwoven with the invalid system that it is unable to stand alone. Dorchy v. Kansas, 264 U.S. 286, 289–290, 44 S.Ct. 323, 68 L.Ed. 686, 689–690 (1924).

 Applying these principles to the facts in this case and to the twenty

3. "It is hereby declared to be the intention of the city council that the sections, paragraphs, sentences, clauses and phrases of this Code are severable, and if any phrase, clause, sentence, paragraph or section of this Code shall be declared unconstitutional by the valid judgment or decree of any court of competent jurisdiction, such

unconstitutionality shall not affect any of the remaining phrases, clauses, sentences, paragraphs and sections of this Code, since the same would have been enacted by the city council without the incorporation in this Code of any such unconstitutional phrase, clause, sentence, paragraph or section."

per cent standard set out in section 5(f) and (g) of Chapter 32, the Court concludes that:

(1) It should confine the constitutional issues in the case to section 5(f) and (g) of Chapter 32, which set out the twenty per cent standard, the only provisions upon which the plaintiff was denied its permit to solicit in Fort Worth, and the only provision upon which there was any contest below.

(2) Considering the intent of the legislative body as expressed in the severability provisions of Section 1–4 of Chapter 1, it was intended that the twenty per cent standard should remain intact even if the more discretionary provisions of Chapter 32 were declared invalid under a direct constitutional attack.

(3) The twenty per cent standard is a reasonable one. Plaintiff offered no proof to the contrary.

(4) The twenty per cent standard is a definite one. The phraseology in the ordinance does not cast it in any degree of ambiguity.

(5) The twenty per cent standard, standing alone, can be given legal effect. The standard, by itself, could form a basis for the granting or refusal of a permit to solicit on the streets of Fort Worth.

(6) The twenty per cent standard is a valid and constitutional standard. This is especially true when its application is confined to the facts of this case.

▄ The only issue remaining is the plaintiff's contention that the classification of the organizations in Section 3 of Chapter 32, which are exempted from the requirements of the ordinance, is so discriminatory, arbitrary, and unreasonable that it denies the plaintiff the equal protection of the laws guaranteed by the Fourteenth Amendment. The burden of proof is on the plaintiff to show that the classification is arbitrary and unreasonable. Goldblatt v. Town of Hempstead, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962); Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 79, 31 S.Ct. 337, 55 L.Ed. 369, 377 (1911); Evanston Cab

Co. v. City of Chicago, 7 Cir., 325 F.2d 907 (1963), cert. den. 377 U.S. 943, 84 S.Ct. 1349, 12 L.Ed.2d 306; Sinclair Refining Co. v. City of Chicago, 7 Cir., 178 F.2d 214 (1950).

"The rules by which this contention must be tested, as is (sic) shown by repeated decisions of this court, are these: 1. The equal protection clause of the 14th Amendment does not take from the state the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis, and therefore is purely arbitrary. 2. A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety, or because in practice it results in some inequality. 3. When the classification in such a law is called in question, if any state of facts can reasonably be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed. 4. One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary." Lindsley v. Natural Carbonic Gas Co., supra, 220 U.S. at pp. 78–79, 31 S.Ct. at p. 340. See also: Independent Dairymen's Ass'n. v. City and County of Denver, 10 Cir., 142 F.2d 940 (1944); Ex Parte Rubin, Tex.Cr.App., 362 S.W.2d 331, 334 (1962).

▄ The Court is of the opinion that there is nothing unreasonable or arbitrary in exempting from the permit requirements of Chapter 32 churches and other organizations who solicit only from their memberships. The considerations in such solicitations are different from solicitations from the general public on public streets and in house to house canvasses. The classification does not therefore deny the plaintiff the equal protection of the laws guaranteed to it by the Fourteenth Amendment.

The plaintiff's motion for summary judgment will therefore be overruled;

**190**

and defendant's motion for summary judgment will be granted. A summary judgment will be entered denying the plaintiff the relief it seeks. This decision does not prohibit the plaintiff from conducting its March of Dimes campaign. To do so, it has only to meet the reasonable requirement of the ordinance above discussed, just as all the other bona fide charitable organizations are doing.