INDEPENDENT TAXICAB OPERA-
TORS' ASSOCIATION OF SAN
FRANCISCO et al., Plaintiffs,

v.

YELLOW CAB CO. (OF SAN FRANCIS-
CO), a corporation, W. Lansing Roths-
child, M. R. Lance, Inc., Does Three
through Two Hundred, inclusive, De-
fendants.

No. 39613.

United States District Court
N. D. California.

Jan. 15, 1968.

James Martin MacInnis, and Arthur H. Tibbits, San Francisco, Cal., for plaintiffs.

Willard P. Norberg, Ackerman, Johnston, Norberg & Parkinson, San Francisco, Cal., for defendants.

## MEMORANDUM OPINION ON FINDINGS OF FACT AND CONCLUSIONS OF LAW

WEIGEL, District Judge.

Plaintiffs are twenty-four San Francisco taxicab owners and operators. Their amended antitrust complaint[1] al-

1. The caption above is that of the amended complaint. A number of the plaintiffs named in that amended complaint, including Independent Taxicab Operators Association of San Francisco, are no longer in the case. Independent Taxicab Operators Association was dismissed because it was not a real party in interest. Frank Hayden was dismissed pursu-
ant to Fed.R.Civ.P. 25(a) (1). Bernard Prochnow was dismissed because he predeceased the filing of the complaint. Lillian Siegel and Elizabeth Scoma were dismissed at the end of plaintiffs' case for lack of evidence to support a claim. All other plaintiffs were dismissed either for failure to comply with orders of the court for the production of documents or

leges that the defendants had engaged knowingly and continuously in a combination and conspiracy to monopolize the general and interstate taxicab business in the City and County of San Francisco in restraint of interstate trade and commerce in violation of the Sherman Act, §§ 1, 2, 15 U.S.C. §§ 1, 2 (1964). They seek treble damages and injunctive relief pursuant to section 4 of the Clayton Act, 15 U.S.C. § 15 (1964). The complaint covers the time period from March 9, 1957, through March 9, 1961.

The defendants named in the complaint are Yellow Cab Co. (hereinafter "Yellow"), a Nevada corporation, which conducts its taxicab business in the San Francisco area; W. Lansing Rothschild, deceased president and part owner of Yellow; and M. R. Lance, Inc., a Missouri corporation, majority stockholder of Yellow. Only Yellow remains a defendant.[2]

Plaintiffs and Yellow compete in San Francisco. Their taxicab businesses are subject to regulations set forth in the San Francisco, Cal., Municipal Code. Pursuant to the Code, the unified city and county issues a limited number of permits or licenses to taxicab owners. Since 1946 this number has remained constant at 739. Yellow owns 503 permits. The remaining 236 are owned by independent cab operators. Plaintiffs own a combined total of 25 of the 236 permits.

All licensed cabs are restricted as to where, when, and how they may wait for, discharge, and pick up passengers on the public streets. The Code provides for two types of taxicab stands, public and exclusive. "Public stands" (or so-called "open stands") are those at docks, railroad depots, and certain designated public squares. "Exclusive stands" are designated by the Department of Public Works (formerly by the Chief of Police) and require the written consent of the tenant, lessee, or owner of the building fronting the space where such stands are to be located. During the years in question, 1957 to 1961, Yellow had approximately 200 exclusive stands throughout the city. All other cab owners had a combined total of approximately 50.

Plaintiffs criticize numerous practices of Yellow and charge that, viewed as a whole, Yellow's course of conduct violates the antitrust laws. While the court has carefully considered each challenged practice, not every one will be discussed individually. For the sake of brevity, plaintiffs' charges will be summarized and categorized under nine major headings.[3]

1. Plaintiffs cannot stop at Yellow's exclusive stands to wait for passengers. As a result, plaintiffs are forced "to cruise" in search of fares. The extra cruising results in a higher cost of operation. Plaintiffs further charge that when non-Yellow cabs have attempted to stop at an exclusive Yellow stand, Yellow drivers have physically bumped the non-Yellow cab drivers in an effort to drive them off. Moreover, hotel doormen in front of hotels where Yellow has exclusive stands will not let non-Yellow cabs pick up passengers unless there is no Yellow cab in sight. And finally, San Francisco policemen will give non-Yellow

for failure to answer interrogatories.

The twenty-four plaintiffs who remain are: Amanzo Angeli, Samuel Bell, George Bikakis, Albert Boyd, Mrs. Alvera Celia, James Daniels, John DeCota, Francis Fitzgibbons, Raymond Fratini, Gerald Frelson, William Lazar, Ida Lynchner, Roy Marcotte, William Marcotte, James Moore, Leroy O'Farrell, Henry Rasmussen, Louis Roskie, Alvin Smith, Frederick Smith, Frank Therriault, Thomas Thompson, Walter Williams, and Walter Zagoren.

2. W. Lansing Rothschild was dismissed pursuant to Fed.R.Civ.P. 25(a) (1). M. R. Lance, Inc., was never served and did not appear.

3. It should be made clear at the outset that this court expresses no view "approving" Yellow's practices nor, indeed, the wisdom of relevant San Francisco regulations. The force of its conclusions is spent in finding that plaintiffs have not, in this case, met their burden of proof.

cab drivers citations if they stop in exclusive Yellow stands.

2. Yellow controls 68% of the taxicab business in San Francisco by reason of purchase and acquisition of or merger with competing taxicab companies during the 1920's and 1930's. Plaintiffs do not deny that Yellow had thus consolidated its position before 1957.

3. By virtue of its size, Yellow has greater buying power than the independents. Yellow can purchase its equipment for less. In return for advertising Standard Oil products, Yellow can purchase its gasoline requirements for less.

4. Yellow takes advantage of its numerous permits to "flood" certain stands such as at the Cow Palace or the Opera House in order to keep independents away from the business.

5. From 1932 to 1940, Yellow maintained a "goon squad" on the waterfront. By beatings and threats of beatings, the independents were barred from the docks.

6. Until 1958 Yellow starters and steamship company employees excluded plaintiffs from access to the piers to pick up passengers. Between 1958 and 1961 the practice continued at all piers except those of American President Lines.

7. During the years when the Ferry Building was a transcontinental terminal, Yellow had an exclusive stand and plaintiffs were prohibited from stopping there to pick up passengers.

8. Yellow has agreements with the Southern Pacific Co. and Santa Fe Co. which effectively exclude all independent taxicabs from equal opportunities at the depot and station respectively.

9. Yellow sold scrip at a 10% discount before 1958 and at 5% thereafter in conformity with a municipal ordinance.

Over-all, plaintiffs urge that the facts outlined above (plus a few others to be considered later) compel the inference that Yellow has conspired and combined to secure for itself a monopolistic position in San Francisco, and that by virtue of its monopoly, Yellow has been able to induce others to refuse to deal with the independent taxicab owners, or, at least, to refuse to deal with them on equally favorable terms.

In a treble damage action under 15 U.S.C. § 15 (1964), a plaintiff has the burden of proof to establish: "(1) that the defendant has violated the antitrust laws; (2) that plaintiff has suffered an injury to his business or property susceptible of being described with some degree of certainty in terms of money damages; and (3) that a causal connection exists between the defendant's wrongdoing and the plaintiff's loss." Continental Ore Co. v. Union Carbide & Carbon Corp., 289 F.2d 86, 90 (9th Cir. 1961), rev'd on other grounds, 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962).

In considering (1), whether defendant has violated the antitrust laws, the court is called upon to examine the reach of the Sherman Act. Congress enacted the statute in the exercise of power to regulate interstate commerce. See Atlantic Cleaners & Dyers, Inc. v. United States, 286 U.S. 427, 435, 52 S.Ct. 607, 76 L.Ed. 1204 (1932). Congress exercised its power fully. Thus, section 1 of the Act outlaws unreasonable restraints on interstate commerce, regardless of the amount of the commerce affected. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 225 n. 59, 60 S. Ct. 811, 84 L.Ed. 1129 (1940). And section 2 of the Act outlaws conspiracies to monopolize *any* part of interstate commerce without specifying how large the part must be. United States v. Yellow Cab Co., 332 U.S. 218, 225, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947). The antitrust laws likewise outlaw purely local restraints which produce an effect on the free flow of interstate trade or commerce. Moore v. Mead's Fine Bread Co., 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145 (1954); United States v. Women's Sportswear Mfrs. Ass'n, 336 U.S. 460, 69 S.Ct. 714, 93 L.Ed. 805 (1949); Las Vegas Merchant Plumbers Ass'n v. United States, 210 F.2d 732 (9th Cir.), cert. denied, 348 U.S. 817, 75 S.Ct. 29, 99 L.Ed. 645 (1954).

In view of the statutory and jurisdictional requirement that interstate commerce must be affected, it becomes necessary to decide here whether any part of the taxicab business in San Francisco is a part of interstate commerce, and whether the conduct complained of affects that part of the business. See Page v. Work, 290 F.2d 323, 330 (9th Cir. 1961). The Supreme Court in United States v. Yellow Cab, supra, has held that the transportation by taxicab of out of state passengers between railroad terminals is a part of the stream of interstate commerce. By contrast, the case holds that the transportation of interstate passengers between a railroad station and home or office is *not* an integral part of interstate commerce. For recent applications of these distinctions, see Evanston Cab Co. v. City of Chicago, 325 F.2d 907 (7th Cir. 1963), cert. denied, 377 U.S. 943, 84 S.Ct. 1349, 12 L.Ed.2d 306 (1964); Parmelee Transp. Co. v. Keeshin, 292 F.2d 794 (7th Cir.), cert. denied, 368 U.S. 944, 82 S.Ct. 376, 7 L.Ed.2d 340 (1961).

■ Plaintiffs and defendant in the instant case sharply disagree about the amount of taxicab business in San Francisco that derives from the terminal to terminal transfer of interstate travelers. Some of the plaintiffs estimate that as much as 25% of their business comes from terminal to terminal transportation. Defendant insists that not more than .001% of its business involves terminal to terminal transportation. The exact dollar amount of volume is not important so long as the interstate commerce involved is not insubstantial. See International Salt Co. v. United States, 332 U.S. 392, 396, 68 S.Ct. 12, 92 L.Ed. 20 (1947). Without deciding what the precise figure in fact is, it can, nevertheless, reasonably be concluded that any *de minimus* exception to the application of the antitrust laws would not apply here. San Francisco is a gateway city to Hawaii and the Orient. Passengers arriving by train or plane make direct transfers to ships and vice versa. The volume of taxicab business derived from interstate commerce is not insubstantial.

■ Even so, plaintiffs must further show that the practices of which they complain affect that interstate commerce.

"The word 'affect' is used in two different situations under the antitrust laws. A case under the antitrust laws, so far as the interstate commerce element is concerned may rest on one or both of two theories:

"(1) That the acts complained of, occurred within the flow of interstate commerce. This is generally referred to as the 'in commerce' theory.

"(2) That the acts complained of, occurred wholly on the state or local level, in intrastate commerce, but substantially *affected* interstate commerce.

"Under both of these theories, the transactions complained of must *affect or have an effect* on interstate commerce or the requirements of the statute are not satisfied." Las Vegas Merchant Plumbers Ass'n v. United States, 210 F.2d 732, 739–740 n. 3 (9th Cir.), cert. denied, 348 U.S. 817, 75 S.Ct. 29, 99 L.Ed. 645 (1954).

■ Some of plaintiffs' charges are encompassed by the first theory and some by the second. The effect on interstate commerce of practices embraced by the first theory are obvious. For example, plaintiffs charge that Yellow's contract with the Santa Fe Co. deprives plaintiffs of an equal opportunity to compete for the business of transporting passengers. Some of the business at the Santa Fe Station undoubtedly would be interstate trade As an example of practices embraced by the second theory, defendant's exclusive taxicab stands can only deprive the plaintiffs of purely intrastate business. But, practices of Yellow which are not directed toward the terminal to terminal trade, but which limit the ability of the independents (the plaintiffs) to compete successfully with Yellow, can substantially affect interstate commerce. If the independents are

eliminated as competitors, the terminal to terminal, or interstate, business must necessarily suffer. Thus, the purely local restraints charged by the plaintiffs are within the purview of the antitrust laws.

Assuming that Yellow's conduct, if pursued to its ultimate objective, would have the requisite harmful effect on interstate commerce, do the practices alleged nevertheless fail to constitute a violation of the Sherman Act as charged? In other words, have the plaintiffs satisfied their burden of proving that the practices complained of show a combination or conspiracy in restraint of the taxicab business or a combination or conspiracy in furtherance of the creation or perpetuation of a monopoly? In seeking to answer this question, practices alleged by the plaintiffs to be unlawful will be examined individually.

### 1. Exclusive Stands.

Many of the plaintiffs' grievances are directed at Yellow's exclusive taxicab stands on public streets and private property. In fact, one plaintiff admitted that the exclusive stands were his only grievance. Hotel doormen won't let independent cabs stop in exclusive stands to pick up passengers if a Yellow Cab is available. Policemen, seeing non-Yellow cabs stopped at exclusive stands, order them to move on with the threat of a citation. Yellow cabs will physically "bump" non-Yellow cabs off the stands. This denial of access to the exclusive stands places plaintiffs at a competitive disadvantage. Since the exclusive stands are on portions of the public street or private property comprising the most lucrative locations for taxicab operation, plaintiffs are damaged by denial of access.

However, proof of the plaintiffs' competitive disadvantage in and of itself does not suffice to prove that Yellow has violated the antitrust laws. If Yellow occupies a favored position because of legal actions taken by city government, it is not in violation of the Sherman Act. Therefore, the practices alleged must be judged by reference to the relevant municipal ordinances. The San Francisco, Cal., Police Code § 1119 expressly authorizes the creation of exclusive taxicab stands. And the California Supreme Court in In re Petersen, 51 Cal.2d 177, 331 P.2d 24, 77 A.L.R.2d 1291 (1958) expressly upheld their constitutionality and legality. The court cited various advantages which might accrue to property owners and to the city from the creation of exclusive stands. Plaintiffs are not here challenging the constitutionality of the exclusive stand system; they argue that the exclusive stands were required pursuant to unlawful conspiracy between Yellow and adjacent landowners and Yellow and public officers.

Plaintiffs properly contend that the rationale of Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed. 2d 464 (1961), which excepts conspiracies to influence legislation from the Sherman Act, does not apply if the conspiracy includes public officials. See Harman v. Valley Nat'l Bank, 339 F.2d 564 (9th Cir. 1964). But plaintiffs must still satisfy their burden of proving that there was in fact a conspiracy. Plaintiffs have utterly failed to meet this burden. In so finding, the court realizes, of course, that direct evidence of conspiracy to restrain trade or to monopolize is not usually forthcoming, and that therefore the finder of fact is permitted to make reasonable inferences on the basis of the overt acts proved. See, e., g., Theatre Enterprises, Inc. v. Paramount Film Distrib. Corp., 346 U.S. 537, 540, 74 S.Ct. 257, 98 L.Ed. 273 (1958). But the facts proved by plaintiffs indicate at most, that Yellow may have sought to maintain the advantages that the exclusive stands legally entitled it to have.

Plaintiffs attempted to prove that Yellow paid landowners to get their consent for exclusive Yellow stands adjoining their property. The evidence reveals that at every such location Yellow has a telephone on the property and Yellow's payment was for the telephone lo-

cation alone. In any case, a lawful agreement for consideration with a property owner would certainly not prove a conspiracy to restrain trade. The agreement is of the type contemplated by section 1119 of the Police Code.

## 2. *Mergers.*

Plaintiffs contend that Yellow's combination and conspiracy to monopolize is evidenced by its mergers and acquisitions of competing companies. All the mergers and acquisitions were completed by 1935. This lawsuit pertains only to the period from March 9, 1957, to March 9, 1961. Evidence of these past practices was admissible as background information to show a continuing course of conduct. See United Mine Workers v. Pennington, 381 U.S. 657, 670 n. 3, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). But no liability attaches to Yellow in this lawsuit for those specific acts. 15 U.S.C. § 15b (1964). The statute of limitations began to run from the time those overt acts caused damage to the plaintiffs. See Steiner v. 20th Century Fox Film Corp., 232 F.2d 190, 195 (9th Cir. 1956). And the plaintiffs admit that they suffered damages before 1957 by virtue of Yellow's dominant position, which was achieved by merger and acquisition of competitors.

Plaintiffs cannot rely on the mergers and acquisitions, even if they violated the Sherman Act, to establish that the overt acts occurring during the relevant 1957–1961 period were also part of the same conspiracy. This crucial fact must be proved by independent evidence. Cf. Dart Drug Co. v. Parke, Davis & Co., 120 U.S.App.D.C. 79, 344 F.2d 173 (1965).

## 3. *Large Scale Buying.*

Plaintiffs point to Yellow's ability to purchase insurance, gasoline, tires, etc., at a discount as evidence that Yellow has violated the Sherman Act. Large scale buying is not a *per se* violation of the Sherman Act. United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948). Plaintiffs have failed to prove an oppressive or coercive exercise of Yellow's buying power which has tended in any way to restrain the taxicab trade.

## 4. *"Flooding".*

The plaintiffs charge that although Yellow has 503 permits, it keeps an average of only 310 vehicles on the street at any one time, holding the rest in reserve and utilizing them for peak business to flood depots, the Opera House, Civic Auditorium, etc., in order to keep independent cabs away from potential customers at those places. But the plaintiffs do not rely on these practices to prove that Yellow is guilty of monopolization or an attempt to monopolize. Plaintiffs rested their case exclusively on a theory of conspiracy or combination. Since Yellow cannot conspire with itself, see Timken Roller Bearing Co. v. United States, 341 U.S. 593, 606, 71 S.Ct. 971, 95 L.Ed. 1109 (1951) (dissent); Nelson Radio & Supply Co. v. Motorola, 200 F.2d 911, 914 (5th Cir.), cert. denied, 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1952), the inference the plaintiffs seem to urge is that Yellow conspired with the City and County of San Francisco in the acquisition of the 503 permits. To buttress that contention, plaintiffs contend that the taxicab detail demands reports from the independents if they are going to keep their cabs off the street for more than twenty-four hours. By contrast, Yellow often has as many as 200 idle cabs without objection from the police detail. Section 1079 of the Police Code is relevant on this point. It reads in part:

> "Continuous Operation—Revocation Provided for. All persons, firms or corporations within the purview of Sections 1075 to 1081, inclusive, of this Article shall regularly and daily operate his or its licensed motor vehicle for hire business during each day of the license year to the extent reasonably necessary to meet the public demand for such motor vehicle for hire service. * * *"

The taxi detail might conclude that the "reasonably necessary" opera-

tion of a fleet of 500 taxicabs is different from the "reasonably necessary" operation of one taxicab or a very small "fleet" of them. Therefore, closer scrutiny by the taxi detail of the operation of the independents fails to support the inference that Yellow and the city officers have conspired to allow Yellow 503 permits in order that Yellow can restrain the independents from competing for the peak business. Finally, permits are no doubt issued with an eye toward the City's requirements for taxicabs at peak business hours. Nothing in the record indicates that there is insufficient patronage for all taxicabs during such hours.

### 5. *Goon Squad.*

■ Plaintiffs did provide convincing proof that during the '30s and early '40s, Yellow employed a "goon squad" on the docks in San Francisco. If independents attempted to pick up passengers at the docks, the independents ran the risk of being beaten. Deplorable as conditions at the docks were, they are not evidence of conspiracy. Instead, they evidence unilateral action by Yellow.

### 6. *Docks.*

■ The plaintiffs complained further about conditions at the docks. The testimony was conflicting. There was complete agreement that in 1958 the independents concluded a contract with American President Lines (APL) whereby the independents agreed to pay part of the salary of the APL guards in exchange for rights to enter onto the docks. Some of the plaintiffs testified that other docks besides APL's had been closed to them and remained closed until about March 1961. But according to the testimony of other plaintiffs, the APL docks were the only ones from which they had ever been excluded. Other witnesses testified similarly. Thus, the general picture emerging from the situation at the docks was that APL indeed was closed to the independents until 1958, but that the other docks were not.

In connection with APL, the plaintiffs have failed to offer convincing proof that the docks were closed as the result of a combination or conspiracy.

### 7. *Ferry Building.*

Plaintiffs complained that they were barred from the Ferry Building during the time that the Ferry Building was a transcontinental terminal. The fact remains, however, that Yellow occupied a stand there pursuant to authority of the Board of Harbor Commissioners. The fee was $125.00 per month. Since the independents had no permit to stand at the Ferry Building, they were subject to section 32 of Title 7 of the California Administrative Code, which makes it unlawful for any vehicle to stop in a designated stand without express authority from the Board. On the facts as shown from the record, the plaintiffs have failed to establish any conspiracy in connection with the Ferry Building in violation of the Sherman Act.

### 8. *Southern Pacific Co. and Santa Fe Co.*

■ During the period in question, 1957–1961, Yellow had a lease agreement with the Southern Pacific Co. which enabled Yellow to come onto Southern Pacific's property and thereby have readier access to arriving passengers. Yellow also had an agreement with the Santa Fe Co. which gave Yellow the exclusive right to transport Santa Fe passengers from the Santa Fe Depot to the Southern Pacific Depot. Although both of these contracts may have given Yellow a competitive advantage, the antitrust laws do not proscribe these contracts absent some showing that they were of indefinite duration or otherwise unduly restrictive of trade. And no such evidence was offered in this case. See Parmelee Transp. Co. v. Keeshin, 292 F.2d 794 (7th Cir.), cert. denied, 368 U.S. 944, 82 S.Ct. 376, 7 L. Ed.2d 340 (1961).

### 9. *Scrip.*

Plaintiffs make a two-pronged attack against Yellow's issuance of scrip. First, they contend that Yellow dispensed scrip free to city officials, adjacent landowners, and leading businessmen; second,

that Yellow sold scrip at a 10% discount until 1958, when a city ordinance was enacted setting the discount limit at 5%. Thereafter, during the years in question, Yellow sold its scrip at a 5% discount. Plaintiffs' first charge carries the suggestion that Yellow was improperly creating good will for itself; the second charge, the suggestion of unlawful price cutting.

■ With these charges, plaintiffs have failed to prove any violations of the antitrust laws. The record indicates that the scrip given to adjacent landowners was a form of rent for Yellow's telephone on the landowner's property. The mere fact that scrip was given to businessmen and city officials, without more, cannot support an inference of a conspiracy to restrain the taxicab trade. Plaintiffs have offered no evidence whatsoever that any of the recipients of the scrip were in any way connected with any of Yellow's so-called restrictive practices.

■ The 10% discount amounts to no more than a charge of price cutting. Price cutting is not illegal *per se* under the Sherman Act; therefore, plaintiffs have the burden of proving that the discount was unreasonable. See Gold Fuel Service Inc. v. Esso Standard Oil Co., 306 F.2d 61 (3d Cir. 1962), cert. denied, 371 U.S. 951, 83 S.Ct. 506, 9 L.Ed.2d 500 (1963). The Supreme Court decisions in Radiant Burners, Inc. v. Peoples Gas Light & Coke Co., 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961) and Klor's, Inc. v. Broadway Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) excuse plaintiffs from proving public injury, but they do not excuse plaintiffs from proving a violation of the Sherman Act. And where the practices charged are not illegal *per se,* plaintiffs must prove that the practices unreasonably restrain trade. The plaintiffs made no such factual showing. On the contrary, the plaintiffs themselves admit to following the practice of issuing scrip at a discount.

10. *Miscellaneous.*

■ The plaintiffs also attacked Yellow's voucher business, a credit arrangement between Yellow and some large businesses in San Francisco as well as between Yellow and out of state tour groups. Nothing whatever about these arrangements suggests any violation of the antitrust laws. Because of Yellow's size it was able to compete for this segment of the market, whereas the plaintiffs could not. But that in and of itself does not prove a violation. See United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948).

Similarly, the court finds no legal merit in the charges involving Yellow's contract with the airport executed in 1964, nor Yellow's historic opposition to "open stands" in San Francisco, nor Yellow's support for taxi fare increases, nor Yellow's agreement with the Union whereby drivers must first work for Yellow.

■■ Apparently—and very belatedly—recognizing that their evidence fell lamentably short of the requisite proof of combination or conspiracy in violation of the Sherman Act, plaintiffs sought leave to amend their complaint to charge monopolization or attempt to monopolize as distinguished from combination or conspiracy to do so. Without explanation, plaintiffs waited almost four months after trial had been concluded before seeking leave to amend. The application must be denied. Leave to amend is within the sound discretion of the trial court and will be denied where fairness to the opposing party so requires. See Royal Indem. Co. v. Olmstead, 193 F.2d 451, 31 A.L.R.2d 635 (9th Cir. 1951); Anderson v. National Producing Co., 253 F.2d 834 (2d Cir.), cert. denied, 357 U.S. 906, 78 S.Ct. 1151, 2 L.Ed.2d 1157 (1958); Inland Steel Prods. v. MPH Mfg. Corp., 25 F.R.D. 236 (N.D.Ill.1959). To grant plaintiffs' application would require, in fairness to defendants, a complete new trial and new discovery. If the practices of which plaintiffs complain persist, and if those

practices transgress laws against monopoly or attempts to monopolize, nothing prevents plaintiffs from seeking appropriate redress in an appropriate forum.

In this Memorandum, constituting Findings of Fact and Conclusions of Law, there has been seriatim discussion of the various practices of Yellow which plaintiffs charge evidence a violation of the Sherman Act. Nevertheless, the practices have been carefully considered collectively in conformity with the dictates of Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). But the evidence just does not show defendants guilty of *combining or conspiring* to restrain trade or to monopolize in violation of the Sherman Act, 15 U.S.C. §§ 1, 2 (1964).

In view of the foregoing conclusion, it is unnecessary to consider the arguments of the parties directed to money damages and injunctive relief.

Counsel for defendants will prepare and serve upon plaintiffs (for the latter's approval as to form only) a Judgment in favor of defendants, which shall include dismissal as to all fictionally named defendants.