Joseph A. Drago, Esq. Corporation Counsel, Schenectady
You have asked that we construe two provisions of your city's charter relating to the voting requirements for the enactment of resolutions and ordinances by the common council. The relevant provisions of the city charter were enacted by special act of the State Legislature. One provides that:
 "A majority of the Aldermen present and voting at any meeting of the Common Council at which a quorum shall be present shall be sufficient to pass any resolution or ordinance, except that no resolution authorizing or involving the expenditure of money or collection of money by tax or assessment shall pass unless it receives the assent of a majority of all the Aldermen in office except as otherwise provided in this act or the local finance law." (Plattsburgh City Charter, § 36.)*
The other section provides that the mayor:
 "shall be the presiding officer of the Common Council and shall have the right to vote upon any question when there is a tie vote in the Common Council." (Id., § 23.)
These two provisions in substantially the same form were originally enacted by chapter 269 of the Laws of 1902. (Normally, we do not interpret locally adopted charters or local laws since the legislative intent is local, presumably reflecting local conditions. Here we are, however, interpreting a State statute.)
The total membership of your common council numbers six. A vote on a matter relating to the expenditure of money has resulted in a 3-3 tie vote. You question whether the mayor may vote to break a tie.
It is a fundamental rule of statutory construction that a statute is to be construed as a whole and that all parts of an act are to be read and construed together to determine the legislative intent (McKinney's vide the service (ibid.). The United States Supreme Court found that:
 "The transportation of such passengers and their luggage between stations in Chicago is clearly a part of the stream of interstate commerce. When persons or goods move from a point of origin in one state to a point of destination in another, the fact that a part of that journey consists of transportation by an independent agency solely within the boundaries of one state does not make that portion of the trip any less interstate in character. That portion must be viewed in its relation to the entire journey rather than in isolation. So viewed, it is an integral step in the interstate movement." (Id., pp 228-229.)
Any attempt to monopolize or restrain such a constituent part of interstate commerce brings the Sherman Act into operation (id., p 229). It is enough if some appreciable part of interstate commerce is the subject of a monopoly, restraint or conspiracy (id., p 225).
In another part of United States v Yellow Cab Co., it was claimed that the affiliated cab companies conspired to induce the city of Chicago to limit the number of licensed taxicabs in the city with the effect that 86% of the licenses would be held by the affiliates and that new operators would be prevented from entering the Chicago cab business (id.,
p 230). The commerce affected by the conspiracy was said to consist of the transportation of interstate travelers to and from Chicago railroad stations (ibid.). The United States Supreme Court found that:
 "[s]uch transportation is too unrelated to interstate commerce to constitute a part thereof within the meaning of the Sherman Act. These taxicabs, in transporting passengers and their luggage to and from Chicago railroad stations, admittedly cross no state lines; by ordinance, their service is confined to transportation `between any two points within the corporate limits of the city.' None of them serves only railroad passengers, all of them being required to serve `every person' within the limits of Chicago. They have no contractual or other arrangement with the interstate railroads. Nor are their fares paid or collected as part of the railroad fares. In short, their relationship to interstate transit is only casual and incidental.
* * *
 "Here we believe that the common understanding is that a traveler intending to make an interstate rail journey begins his interstate movement when he boards the train at the station and that his journey ends when he disembarks at the station in the city of destination. What happens prior or subsequent to that rail journey, at least in the absence of some special arrangement, is not a constituent part of the interstate movement. The traveler has complete freedom to arrive at or leave the station by taxicab, trolley, bus, subway, elevated train, private automobile, his own two legs, or various other means of conveyance. Taxicab service is thus but one of many that may be used. It is contracted for independently of the railroad journey and may be utilized whenever the traveler so desires. From the standpoints of time and continuity, the taxicab trip may be quite distinct and separate from the interstate journey. To the taxicab driver, it is just another local fare." (Id.,
pp 230-232.)
Cf. Evanston Cab Co. v City of Chicago, 325 F.2d 907 (USCA, 7th Cir, 1963).
In dicta, the Court in Yellow Cab noted that its decision did not establish any absolute rule that local taxicab service to and from railroad stations is completely beyond the reach of the Sherman Act (id., 332 US at 232-233). "A conspiracy to burden or eliminate transportation of passengers to and from a railroad station where interstate journeys begin and end might have sufficient effect upon interstate commerce to justify imposition of the Sherman Act * * *" (id., p 233; cf. Eastman v Yellow Cab Co., 173 F.2d 874 [USCA, 7th Cir, 1949]; Independent Taxicab Operator's Assn. v Yellow Cab Co.,278 F. Supp. 979 [USDC, ND Cal, 1968]).
It is also necessary to show that the anti-competitive practices affect interstate commerce (Independent Taxicab Operator's Assn. v Yellow CabCo., supra, p 984). The requisite "affect" is present when the acts complained of occur within the flow of interstate commerce (known as the "in commerce theory") or when the facts occur wholly on the state or local level but substantially affect interstate commerce (ibid.).
The applicability of the Sherman Act to the city of Schenectady, under the cases cited, depends upon whether the city is engaged in anti-competitive acts that "affect" interstate commerce. This is a question of fact based upon the nature of taxicab service in the city and the impact of regulation.
The next question is whether a municipality possesses immunity from being sued for anti-trust violations under the Sherman Act. It has been decided that a municipality is a "person" as used in the Sherman Act and may sue or be sued under the Act (Lafayette v Louisiana Power Light Co.,435 U.S. 389, 394-395 [1978]).
Parker v Brown, 317 U.S. 341 (1943), involved regulations enacted by the California State Legislature, which established a program enforced by state officials to restrict competition among the growers of raisins and to maintain prices in the distribution of raisins to packers. The United States Supreme Court held that the California Agricultural Prorate Act was not prohibited by the Federal anti-trust laws (ibid.):
 "[I]t derived its authority and its efficacy from the legislative command of the state and was not intended to operate or become effective without that command. We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress.
 "The Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state." (Id., pp 350-351.)
Two standards have evolved for state anti-trust immunity under Parker
(California Liquor Dealers v Midcal Aluminum, 445 U.S. 97 [1980]; Bates vState Bar of Arizona, 433 U.S. 350 [1977]). First, the challenged restraint must be one clearly articulated and affirmatively expressed as state policy; and second, the policy must be actively supervised by the state itself (ibid.). vide the service (ibid.). The United States Supreme Court found that:
 "The transportation of such passengers and their luggage between stations in Chicago is clearly a part of the stream of interstate commerce. When persons or goods move from a point of origin in one state to a point of destination in another, the fact that a part of that journey consists of transportation by an independent agency solely within the boundaries of one state does not make that portion of the trip any less interstate in character. That portion must be viewed in its relation to the entire journey rather than in isolation. So viewed, it is an integral step in the interstate movement." (Id., pp 228-229.)
Any attempt to monopolize or restrain such a constituent part of interstate commerce brings the Sherman Act into operation (id., p 229). It is enough if some appreciable part of interstate commerce is the subject of a monopoly, restraint or conspiracy (id., p 225).
In another part of United States v Yellow Cab Co., it was claimed that the affiliated cab companies conspired to induce the city of Chicago to limit the number of licensed taxicabs in the city with the effect that 86% of the licenses would be held by the affiliates and that new operators would be prevented from entering the Chicago cab business (id.,
p 230). The commerce affected by the conspiracy was said to consist of the transportation of interstate travelers to and from Chicago railroad stations (ibid.). The United States Supreme Court found that:
 "[s]uch transportation is too unrelated to interstate commerce to constitute a part thereof within the meaning of the Sherman Act. These taxicabs, in transporting passengers and their luggage to and from Chicago railroad stations, admittedly cross no state lines; by ordinance, their service is confined to transportation `between any two points within the corporate limits of the city.' None of them serves only railroad passengers, all of them being required to serve `every person' within the limits of Chicago. They have no contractual or other arrangement with the interstate railroad. Nor are their fares paid or collected as part of the railroad fares. In short, their relationship to interstate transit is only casual and incidental.
* * *
 "Here we believe that the common understanding is that a traveler intending to make an interstate rail journey begins his interstate movement when he boards the train at the station and that his journey ends when he disembarks at the station in the city of destination. What happens prior or subsequent to that rail journey, at least in the absence of some special arrangement, is not a constituent part of the interstate movement. The traveler has complete freedom to arrive at or leave the station by taxicab, trolley, bus, subway, elevated train, private automobile, his own two legs, or various other means of conveyance. Taxicab service is thus but one of many that may be used. It is contracted for independently of the railroad journey and may be utilized whenever the traveler so desires. From the standpoints of time and continuity, the taxicab trip may be quite distinct and separate from the interstate journey. To the taxicab driver, it is just another local fare." (Id.,
pp 230-232.) Cf. Evanston Cab Co. v City of Chicago, 325 F.2d 907 (USCA, 7th Cir, 1963).
In dicta, the Court in Yellow Cab noted that its decision did not establish any absolute rule that local taxicab service to and from railroad stations is completely beyond the reach of the Sherman Act (id., 332 US at 232-233). "A conspiracy to burden or eliminate transportation of passengers to and from a railroad station where interstate journeys begin and end might have sufficient effect upon interstate commerce to justify imposition of the Sherman Act * * *" (id., p 233; cf. Eastman v Yellow Cab Co., 173 F.2d 874 [USCA, 7th Cir, 1949]; Independent Taxicab Operator's Assn. v Yellow Cab Co.,278 F. Supp. 979 [USDC, ND Cal, 1968]).
It is also necessary to show that the anti-competitive practices affect interstate commerce (Independent Taxicab Operator's Assn. v Yellow CabCo., supra, p 984). The requisite "affect" is present when the acts complained of occur within the flow of interstate commerce (known as the "in commerce theory") or when the facts occur wholly on the state or local level but substantially affect interstate commerce (ibid.).
The applicability of the Sherman Act to the city of Schenectady, under the cases cited, depends upon whether the city is engaged in anti-competitive acts that "affect" interstate commerce. This is a question of fact based upon the nature of taxicab service in the city and the impact of regulation.
The next question is whether a municipality possesses immunity from being sued for anti-trust violations under the Sherman Act. It has been decided that a municipality is a "person" as used in the Sherman Act and may sue or be sued under the Act (Lafayette v Louisiana Power Light Co.,435 U.S. 389, 394-395 [1978]).
Parker v Brown, 317 U.S. 341 (1943), involved regulations enacted by the California State Legislature, which established a program enforced by state officials to restrict competition among the growers of raisins and to maintain prices in the distribution of raisins to packers. The United States Supreme Court held that the California Agricultural Prorate Act was not prohibited by the Federal anti-trust laws (ibid.):
 "[I]t derived its authority and its efficacy from the legislative command of the state and was not intended to operate or become effective without that command. We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress.
 "The Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state." (Id., pp 350-351.)
Two standards have evolved for state anti-trust immunity under Parker
(California Liquor Dealers v Midcal Aluminum, 445 U.S. 97 [1980]; Bates vState Bar of Arizona, 433 U.S. 350 [1977]). First, the challenged restraint must be one clearly articulated and affirmatively expressed as state policy; and second, the policy must be actively supervised by the state itself (ibid.).
In Lafayette v Louisiana Power Light Co., supra, the principal issue was whether the Parker exemption applied to municipalities. The petitioners in Lafayette were two Louisiana cities empowered to own and operate electric utilities which instituted an action under the anti-trust laws against certain private utilities. The private utilities counterclaimed, alleging anti-trust violations by the cities. The cities moved to dismiss the counterclaim based on the exemption declared inParker. A plurality opinion of four judges rejected the cities' argument that all governmental entities, whether state agencies or subdivisions of a state, are, simply by reason of their status as such, exempt from the anti-trust laws (id., p 408). The plurality first noted that not every act of a state agency is that of the state sovereign (id., p 410). It is significant that the state policy requiring the anti-competitive restraint was one clearly articulated and affirmatively expressed as state policy, and that the state's policy was actively supervised by the state (ibid.):
 "[C]ities are not themselves sovereign; they do not receive all the federal deference of the States that create them. Parker's limitation of the exemption to `official action directed by a state,' is consistent with the fact that the State's subdivisions generally have not been treated as equivalents of the States themselves. In light of the serious economic dislocation which could result if cities were free to place their own parochial interests above the Nation's economic goals reflected in the antitrust laws, we are especially unwilling to presume that Congress intended to exclude anti-competitive municipal action from their reach." (Id., pp 412-413.)
However, the fact that municipalities, simply by their status as such, are not within the Parker doctrine, does not mean all their anti-competitive acts are subject to anti-trust restraints (id., p 413). The state can sanction anti-competitive action by municipalities and thereby afford immunity to anti-trust restraint (ibid.). The plurality concluded that the Parker doctrine exempts from anti-trust restraints municipal conduct engaged in "pursuant to state policy to displace competition with regulation or monopoly public service"* (ibid.):
 "[T]his does not mean, however, that a political subdivision necessarily must be able to point to a specific, detailed legislative authorization before it properly may assert a Parker defense to an antitrust suit. While a subordinate governmental unit's claim to Parker immunity is not as readily established as the same claim by a state government sued as such, we agree with the Court of Appeals that an adequate state mandate for anticompetitive activities of cities and other subordinate governmental units exists when it is found `from the authority given a governmental entity to operate in a particular area, that the legislature contemplated the kind of action complained of.'" (Id., p 415.)
We believe that local governments limiting the number of taxicabs to be licensed under the authority of section 181 of the General Municipal Law, are acting under a clearly articulated policy of the State Legislature to displace competition with regulation, and thereby possess immunity to anti-trust liability (Lafayette v Louisiana Power LightCo., supra). Immunity is not affected by the absence in section 181 of standards for licensing, since we believe it is clear from the specific language of the section and the legislative history (supra) that the Legislature contemplated such local limitation of the number of taxicabs as is necessary to relieve street congestion and protect the taxicab business (Lafayette v Louisiana Power Light Co., supra, p 415). It is not necessary that a political subdivision point to a specific, detailed legislative authorization before it properly may assert Parker immunity to anti-trust liability, if the Legislature intended the authority given to the subdivision to include the action taken (ibid.). We believe that the New York State Legislature contemplated the development of local standards for the implementation of section 181.
We note that you refer in your letter to the recent case, CommunityCommunications Company, Inc. v City of Boulder, Colorado, et al.,455 U.S. 40 (1982). The question in this case was whether a city with home rule powers in local and municipal matters, which were granted by the Colorado State Constitution, possessed the "state action" exemption from anti-trust liability announced in Parker. Since cities, towns and villages in New York can regulate taxicabs under the specific authority of section 181 of the General Municipal Law, and need not proceed under constitutionally derived home rule powers, it is unnecessary to consider the impact of Boulder.
We conclude that a city adopting regulations limiting the number of taxicab licenses to be issued, as authorized by State law, and establishing standards for licensing, is, under the state action exemption doctrine, immune from liability under the Sherman Anti-Trust Act. In any event, the Sherman Act would not apply unless the regulated activity affects interstate commerce, as defined by the courts, and no violation would occur unless the city were found to be monopolizing trade or involved in a conspiracy in restraint of trade.
* Under section 41 of the General Construction Law, whenever three or more public officers are given any power or authority to be exercised jointly or as a board or similar body, a majority of the whole number of such officers constitutes a quorum and not less than a majority of the whole number may perform and exercise such power or authority. "Whole number" means the total number which the board, commission or body would have were there no vacancies and where none of the officers would be disqualified from acting. Section 41 is applicable to local bodies (Matter of Smithtown v Howell, 31 N.Y.2d 365 [1972]). The Legislature, through its special act granting a charter to Plattsburgh, authorized less restrictive voting requirements for action by the common council.
* Chief Justice Burger, in a separate opinion, said that this is the threshold question. He would require additional proof that the state compelled the anti-competitive activity and that the exemption from the anti-trust laws was essential to the state's plan (id., pp 425-426).